# United States Court of Appeals for the Federal Circuit

2007-5124


1-10 INDUSTRY ASSOCIATES, LLC,

Plaintiff,

v.

UNITED STATES,

Defendant,

and

MICHAEL FRANCIS KIELY,

Sanctioned Party-Appellant.

Jeffrey Clair, Attorney, Appellate Staff, Civil Division, United States Department of Justice, of Washington, DC, argued for sanctioned party-appellant.

Appealed from:  United States Court of Federal Claims

Judge Francis M. Allegra

# United States Court of Appeals for the Federal Circuit

2007-5124

1-10 INDUSTRY ASSOCIATES, LLC,

Plaintiff,

v.

UNITED STATES,

Defendant,

and

MICHAEL FRANCIS KIELY,

Sanctioned Party-Appellant.

Appeal from the United States Court of Federal Claims
in 04-CV-1209, Judge Francis M. Allegra.

_____

DECIDED: May 21, 2008

_____

Before BRYSON, <u>Circuit Judge</u>, CLEVENGER, <u>Senior Circuit Judge</u>, and DYK, <u>Circuit Judge</u>.

CLEVENGER, <u>Senior Circuit Judge</u>.

On March 19, 2007, the United States Court of Federal Claims issued an order imposing sanctions on Michael F. Kiely for breach of the duty of candor under Rule 11 of the court's rules. Mr. Kiely represents the government in a contract dispute between 1-10 Industry Associates, LLC ("1-10") and the United States Postal Service. 1-10 sued

the government in the Court of Federal Claims for unpaid electric charges under a real estate lease between 1-10 and the Postal Service. The government counterclaimed against 1-10 for unauthorized excess electric charges. 1-10 moved to dismiss the counterclaim as untimely. During the course of a telephonic hearing on 1-10's motion, the court became concerned that Mr. Kiely had breached his duty of candor to the court by misleading it about the date on which the government learned the facts on which its counterclaim was based. The court expressed its concern in the form of an order directed to Mr. Kiely to show cause why he has not violated Rule 11(b) of the Rules of the United States Court of Federal Claims ("RCFC") and should not be subject to sanctions. After Mr. Kiely responded to the show cause order, the court issued its March 19 order imposing the sanction of reprimand.

Mr. Kiely appeals from that order. We have jurisdiction over the collateral sanctions order. See Precision Specialty Metals Inc. v. United States, 315 F.3d 1346, 1352-53 (Fed. Cir. 2003). For the reasons set forth below, the order imposing sanctions is reversed, and the case is remanded.

I

Justice Stevens observed in Cooter & Gell v. Hartmax Corp., 496 U.S. 384, 413 (1990), that the most precious asset of an attorney is his professional reputation. A formal order of sanction of any kind imposed by a court necessarily tarnishes an attorney's professional reputation. Just as it is the duty of the court imposing sanctions to do so only when truly warranted, it is our duty on appeal to review the facts of such a case with great care to determine whether a sanction has been properly imposed. We thus recite the facts of this case in some detail.

## II

The underlying dispute in this case concerns a lease between 1-10 and the United States Postal Service of a portion of a warehouse. Electricity for the leased space was not provided directly to the lessee by the local utility, but instead was sub-metered from 1-10's account for the entire warehouse facility. The lease provides that the Postal Service will pay 1-10, rather than the utility, recurring costs for electricity, provided the charges for the leased space remain separately metered.

1-10 and the Postal Service disagreed about amounts due to 1-10 for electric charges. When the dispute could not be resolved amicably, 1-10 filed a claim under the Contracts Dispute Act, 41 U.S.C. § 605 (2000), seeking reimbursement for allegedly unpaid electric charges. Not having received full satisfaction on its claim, 1-10 filed a complaint on July 23, 2004, in the Court of Federal Claims seeking $56,818.18 in unpaid electric charges.

In late August of 2004, management of the government's defense to 1-10's complaint was delegated to the Commercial and Appellate Litigation Law Department of the Postal Service, and Mr. Kiely (an employee of that department) was assigned to the case. In September and October of 2004, he met with Postal Service personnel to develop information on which the government would answer 1-10's complaint. The answer of general denial was filed on October 8, 2004. On November 6, 2004, Mr. Kiely met with counsel for 1-10 to discuss possible resolution of the case. During the course of that conversation, counsel for 1-10 described the practice by which 1-10 sent electric bills to its various tenants. Counsel for 1-10 informed Mr. Kiely that 1-10's practice was to add a fifteen percent surcharge to each electric bill. Mr. Kiely thus

learned that the government might have a counterclaim to recoup surcharges previously collected by 1-10.

Mr. Kiely considered it necessary to determine independently, as a matter of fact, that 1-10 had surcharged the Postal Service for electricity, because Federal Rule of Evidence 408 bars admission of evidence acquired in compromise negotiations. He also knew that before the government could file a counterclaim in the Court of Federal Claims, it first must obtain a ruling from the contracting officer that it was entitled to recoup the surcharges. In this respect, Mr. Kiely correctly understood the law, as Morton v. United States, 757 F.2d 1273 (Fed. Cir. 1985), squarely holds that the government is subject to the Contracts Dispute Act, and the Court of Federal Claims lacks jurisdiction to entertain a government counterclaim unless and until the contracting officer determines that the government has a claim. Id. at 1281.

On February 28, 2005, the parties filed a joint preliminary status report with the Court of Federal Claims, in which the government identified as a factual and legal issue the question of whether 1-10 was entitled to augment the electricity charges. Later in 2005, Mr. Kiely interviewed Postal Service employees familiar with the lease who denied knowledge of any surcharges. In November, Mr. Kiely deposed two of 1-10's officials, one of whom testified that 1-10 did add a fifteen percent surcharge to electricity bills sent to the Postal Service.

In January of 2006, Mr. Kiely began the process of obtaining a determination from the contracting officer that surcharges had occurred and that they were impermissible under the contract. On February 26, Mr. Kiely met with the contracting officer and asked him if he had been aware that 1-10 applied a fifteen percent

surcharge to the electric bills. The contracting officer denied any knowledge of such surcharges. After review of the file on the lease, on April 3, 2006, the contracting officer issued a demand letter to 1-10 sustaining the government's claim to recoup previous surcharges. With a decision by the contracting officer in hand, the government on May 5, 2006, filed a counterclaim in the Court of Federal Claims demanding $106,076.14 for surcharges on electricity bills since 1990.

On June 23, 2006, 1-10 moved to dismiss the government's counterclaim, both as untimely and unwarranted on the merits. As to the timeliness issue, 1-10 argued that the government had known of the surcharges for at least ten years, based on copies of authorized payments of electricity invoices from 1996 showing "+15%" on their face attached to the motion. 1-10 characterized the government's counterclaim as a compulsory counterclaim, which under RCFC 13(a) must be filed at the time of the answer. According to 1-10, the government's lack of attention to the surcharges for at least ten years did not excuse the failure to have timely filed the compulsory counterclaim.

On August 8, 2006, the government filed its opposition to 1-10's motion to dismiss the counterclaim. The government's response was signed by Mr. Kiely. The government's response did not deny 1-10's allegation that the government had known of the surcharges for at least ten years, nor did the government's response attempt to justify the late filing of a compulsory counterclaim based on oversight, inadvertence or excusable neglect under RCFC 13(f). Instead, the government argued that the propriety of its counterclaim should be measured under RCFC 13(e), which provides that the court "may permit a party to amend a pleading to file a supplemental pleading

asserting a counterclaim that matured or was acquired by the party after serving an earlier pleading."

The government thus argued that for purposes of jurisdiction of the Court of Federal Claims, its counterclaim did not "mature" for purposes of RCFC 13(e) until the contracting officer issued his decision on April 3, 2006. The government asserted that the one-month lapse of time between the contracting officer's decision and the filing of the counterclaim should not disqualify it under RCFC 13(e). In the course of describing the decision of the contracting officer, which was the jurisdictional predicate for the government's counterclaim, the government's opposition to the motion to dismiss asserted that "the contracting officer has stated that he was not aware of the claim until February of 2006." The government's opposition did not mention any of the case history recounted above from Mr. Kiely's first learning of possible grounds for a counterclaim in November of 2004 to the date Mr. Kiely informed the contracting officer of the surcharges.

Instead, consistent with its theory that the counterclaim would lie under RCFC 13(e), the government argued that the counterclaim, for jurisdictional purposes, was "not in existence" at the time the government served its answer to the complaint. 1-10's response to the government's opposition to the motion to dismiss continued to treat the counterclaim as a compulsory one filed too late under RCFC 13(a). 1-10 thus emphasized that the government knew of the overcharges since at least 1996. Further, 1-10's response informed the court that Mr. Kiely learned of the surcharges during the depositions of 1-10's employees on November 16, 2005.

On November 13, 2006, the court conducted a telephonic hearing on 1-10's motion to dismiss the counterclaim. At the onset, the court explained that the hearing "is going to boil down to a question of whether this is a compulsory counterclaim; if so, whether it matured in advance of the filing date of the complaint here. And if it did, then questions involve whether or not the safety valve provisions of the rules [RCFC 13(f)] would kick in that would still allow the counterclaim to be filed."

The court focused immediately on the issue of when the government first learned of grounds for its counterclaim. The court stated that it was concerned with the government's opposition because, as the court read it, the reference to the contracting officer's only learning of the surcharges in February of 2006 left the impression that the government had no knowledge of the surcharges before that date. The court itself referred to the contents of the February 2005 joint preliminary status report, which indicated that someone in the government must have known of the surcharges. In further colloquy at the hearing between the court and Mr. Kiely, Mr. Kiely related most of the case history from his first learning from 1-10's counsel of possible grounds for a counterclaim, through the events leading up to the government's seeking the ruling from the contracting officer. The court expressed alarm that the details of that history had not been disclosed in the government's answer to the motion to dismiss the counterclaim, which would have put in context the assertion that the contracting officer only learned of the surcharges in February of 2006. The court asked Mr. Kiely whether the statement about the contracting officer's knowledge "[left] the implication that's the first you [Mr. Kiely] knew about it, too, or at least shortly before that?" Mr. Kiely responded:

"Your Honor, I didn't mean to leave that implication. I don't know if that is a necessary inference from that. The contracting officer obviously is the person whose knowledge of this is very important. I shouldn't assert the claim without him, so he's the person who really has to be brought on board and assured that the facts are as we represent them to be."

After hearing from counsel for 1-10, the court referred to the 1996 invoices showing "+15%" and announced it would dismiss the counterclaim as untimely. The court reasoned that the "counterclaim arose prior to the filing of the complaint and therefore was compulsory, that the counterclaim at least should have been raised on a timely basis after knowledge of its potential source occurred to the government, which looks to have occurred at least as of November of 2004, if not February 28, 2005, when I have a joint preliminary status report talking about this. I don't buy the argument that suggests you have to have proof of the counterclaim . . . ." The court thus rejected the government's theory that it could not file its counterclaim without first having a decision from the contracting officer showing a meritorious claim of the government.

The court concluded that the statement that the contracting officer first knew of the surcharges in February of 2006 "if reasonably read leave[s] the impression that the first time anybody knows about this was February of 2006." The court admonished Mr. Kiely: "[y]ou have a duty of candor to me, and I am not particularly pleased about you suggesting one thing here [in the opposition to the motion to dismiss] when you knew something else was true."

The court further specifically addressed Mr. Kiely's conduct, stating "I am very dissatisfied with the brief you filed, Mr. Kiely. I don't think that it at least in my mind

provides the kind of candor that I expect. Now you might have had your reasons but I think that in the future, you need to be thinking twice about making representations to me that you think could be read as inconsistent with what you know to be the case . . . . And so I will decide whether sanctions are appropriate . . . ."

IV

On November 17, 2006, the Court of Federal Claims issued its order to show cause. The order directed Mr. Kiely to show cause why he should not be sanctioned under RCFC 11(c) "for making misrepresentations to the court."

The order identified the misrepresentation as arising from the government's opposition to the motion to dismiss the counterclaim, which had referenced the contracting officer as learning of the counterclaim in February of 2006. The opposition had not mentioned the 1996 bill which showed "+15%," or the November 2005 deposition testimony of 1-10's employee who explained the regular practice of the fifteen percent surcharge. The opposition had also not mentioned Mr. Kiely's conversation with 1-10's counsel in November of 2004. The failure to have disclosed these details "left [the Court] with the impression that the government officials did not know about the counterclaim until sometime shortly before February of 2006."

In particular, the show cause order directed Mr. Kiely (a) to file a detailed affidavit describing how he obtained information regarding the subject of the counterclaim, (b) to provide an explanation of why the information provided in the affidavit was not included in the government's brief in opposition to the motion to dismiss the counterclaim, and (c) to discuss why the court should not sanction Mr. Kiely for such omissions.

On December 1, 2006, Mr. Kiely replied to the show cause order. Mr. Kiely provided the required affidavit, in which he recounted the history of his involvement in the case, substantially as had been revealed during the telephonic hearing on the motion to dismiss.

Mr. Kiely's response to the show cause order addressed each of the factual items identified in the show cause order as the basis for the charge that Mr. Kiely misled the court by suggesting that the government had no knowledge of the basis for the counterclaim until shortly before asking the contracting officer for a determination. As for the May 1996 electric bill showing the "15%," Mr. Kiely pointed out that the bill had been disclosed by 1-10 in paragraph 14 of the motion to dismiss, thus providing the court with the information. Because the government's opposition did not contest the existence of the May 1996 bill, but instead argued at length why payment of the bills containing the surcharge could not estop the government from recouping the surcharges, Mr. Kiely contended that he had not diverted the court's attention from the document.

Mr. Kiely explained that he had not referenced his November 2004 conference with 1-10's counsel because he understood the information obtained at the meeting was privileged under Federal Rule of Evidence 408. Mr. Kiely stated that he had not referenced the November 2005 deposition testimony because he understood "the key event for the maturing of the defendant's counterclaim was the contracting officer's determination." Mr. Kiely explained that he understood that the government's claim would not accrue until the date of the contracting officer's decision, and consequently that date, as opposed to earlier dates, was material to his counterclaim. Finally,

Mr. Kiely argued that the omission of the facts showing government knowledge earlier than February of 2006 could not have misled the court, as the court was informed by the government in the February 2005 joint preliminary status report that it would pursue the issue of augmented electric charges.

Mr. Kiely's response argued that Rule 11 sanctions were not warranted in this case for failure to have identified facts that "he did not consider necessary or relevant to defendant's argument, or that had already been presented in plaintiff's motion." Under Mr. Kiely's theory of the basis for the government's counterclaim, the "key event" was the determination of the contracting officer establishing proof on which the government could mount a counterclaim that would withstand jurisdictional challenge in the Court of Federal Claims. As the government had not tried to justify a late-filed compulsory counterclaim, but instead had sought permission to file a counterclaim under Rule 13(e), Mr. Kiely argued that he should not be sanctioned for omission of facts not necessary or relevant to his theory of the case. And since the court was itself aware of government knowledge of the basis for a counterclaim before the supposedly misleading reference to February of 2006, Mr. Kiely argued that he should not be sanctioned for failure to mention facts that he considered irrelevant to his case, when such information was already known to the court.

V

On March 17, 2007, the Court of Federal Claims issued its order imposing the sanction of reprimand on Mr. Kiely. As a preliminary matter, the court first addressed the test it would apply to determine if sanctions should arise from the facts of this case. The court noted that a split in authority exists over whether an element of bad faith or

intent is required to support sanctions when the inquiry is initiated by the court. The court found more persuasive the cases that permit court initiated sanctions under an objective standard of reasonableness: "the court concludes that it need not find that defendant's counsel acted in bad faith or even intentionally intended to mislead the court, in order to impose sanctions, but instead must analyze his conduct under an objective standard of reasonableness, to wit, whether a reasonable, competent attorney, acting in like circumstances, would have believed a filing to be factually justified."

Because Mr. Kiely does not challenge the test applied by the Court of Federal Claims, we are not called upon to decide whether the court applied the correct test. We express no view on that issue and instead review the facts of this case under the objective standard of reasonableness employed by the court.

The court based its sanctions ruling on the misrepresentation perceived by the court in the government's opposition to the motion to dismiss its counterclaim. Also the court based its ruling on another episode involving Mr. Kiely's appearance before the court in a previous case, even though information about that other episode had not been included in the order to show cause as a basis for possible sanctions in the 1-10 case.

First, with regard to the misrepresentation concerning the counterclaim, the court cited the facts omitted from the opposition to the motion to dismiss—recounted in detail above—and held that those facts were "material—indeed, they were determinative under the applicable rules, which govern the timing of compulsory counterclaims." The court's opinion states that "it strains credibility to suggest that defendant's counsel did

not understand that his statements on brief [that the contracting officer became aware of the counterclaim in February of 2006] would mislead the court into concluding that the Postal Service had only learned of the surcharge a few months before the counterclaim was filed and that there thus had been no undue delay in bringing that claim." The opinion also states that "the timing of when the Postal Service first became aware of the surcharge issue was highly relevant not only to when the claim 'matured or was acquired' under RCFC 13(e), but also to the more straightforward issue whether the defendant had failed to set up the counterclaim 'through oversight, inadvertence, or excusable neglect' under RCFC 13(f)." The court then concluded that Mr. Kiely had violated the duty of candor owed to the court.

The court noted that the advisory committee notes to Rule 11 indicate factors the court may consider in deciding whether to impose sanctions, or in deciding which sanction to impose. Among those factors are whether the conduct in question is part of a pattern of activity and whether the person in question has engaged in similar conduct in other litigation. The court then stated: "Given this guidance, it is unfortunately relevant that this is not the first, but the <u>second</u> time that defendant's counsel has had difficulties with candor before the undersigned."

In <u>R.P. Wallace, Inc. v. United States</u>, No. 96-2226, Mr. Kiely (then an attorney with the Justice Department) represented the government before the Court of Federal Claims. During the course of trial in that case, Mr. Kiely sought to introduce a document that had not previously been identified. The issue of when Mr. Kiely actually knew of the existence of the document was raised by the court. The court expressed concern that the document might have been subject to a discovery request and that its

admission might violate pretrial procedures for the case. Mr. Kiely was ordered to file an affidavit explaining the facts surrounding his discovery of the missing document.

In the order imposing sanctions on Mr. Kiely in this case, the court explained that it was not satisfied with the affidavit filed by Mr. Kiely in the previous case. The court noted that its show cause order had not cited the previous incident, stating that "the court does not read RCFC 11(c)(1)(B) as requiring it to describe in its order every factor that might impact its decision to impose sanctions."

VI

We review an order imposing sanctions under the abuse of discretion standard. Precision Speciality Metals, Inc. v. United States, 315 F.3d 1346, 1354 (Fed. Cir. 2003) (citing Cooter & Gell, 496 U.S. at 405). A court abuses its discretion if the order imposing sanctions is based on "an erroneous view of the law or on a clearly erroneous assessment of the evidence." Id.

RCFC 11(b), which is identical to Rule 11 of the Rules of Civil Procedure, concerns "Representations to Court." Subsection (b) specifies that by presenting a pleading the attorney is certifying that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, "the allegations and other factual contentions [in the pleading] have evidentiary support" and "the denials of factual contentions [in the pleading] have evidentiary support."

In this case, the issue of compliance with RCFC 11 was initiated by the court under RCFC 11(c)(1)(B), which provides that "[o]n its own initiative, the court may enter an order describing the specific conduct that appears to violate subsection (b) and

directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto."

## VII

Mr. Kiely contends, for two independent reasons, that the Court of Federal Claims abused its discretion in entering the sanctions order in this case. First, Mr. Kiely argues as a matter of law that he was entitled to notice and opportunity to be heard before he could be sanctioned at least in part because of previous conduct of concern to the court but not identified in the show cause order.

Second, he argues that the court lacked grounds to sanction him for alleged omissions in the government's response to the motion to dismiss its counterclaim. On this issue, Mr. Kiely sees error in what he describes as a mixed question of fact and law. We address each issue in turn.

## VIII

When sanctions are initiated by the court, RCFC 11(c)(1)(B) requires the court to give notice of "the specific conduct that appears to violate subdivision (b)," and thus to provide an opportunity for the party to show cause why no sanction for the stated conduct is warranted. When a person is charged with sanctionable conduct under Rule 11, the person must have an opportunity in the Rule 11 proceeding to respond to the challenge. Failure to identify conduct that underlies the sanctions order is reversible error, as a matter of law. In re DeVille, 361 F.3d 539, 549 (9th Cir. 2004) (due process requires "advance notice of exactly which conduct was alleged to be sanctionable"); Anjelino v. New York Times, 200 F.3d 73, 100 (3d Cir. 1999) ("The requisite notice must be 'particularized' so that a party is aware of the 'particular factors that he must address

if he is to avoid sanctions.'"); <u>Nuwesra v. Merrill Lynch, Fenner & Smith, Inc.</u>, 174 F.3d 87 (2d Cir. 1999) (per curiam) (reversing sanctions that were primarily based on conduct not identified in show cause order); <u>Thornton v. General Motors</u>, 136 F.3d 450, 454-55 (5th Cir. 1998) (per curiam) (reversing Rule 11 sanction where counsel was not provided with notice of "specific conduct" at issue).

Mr. Kiely's conduct in the <u>Wallace</u> case is revealed from the complete transcripts of that proceeding, which this court has obtained and reviewed. On May 7, 2003, at trial in New Orleans, Mr. Kiely sought to introduce by way of rebuttal a daily report document (Exhibit 23) while examining the plaintiff's key officer. The court questioned when Mr. Kiely had come into possession of the document. Mr. Kiely responded "I think about two weeks ago." Trial Transcript at 816. The court pressed Mr. Kiely further as to the date on which he had discovered the existence of the daily report. Mr. Kiely responded "Your Honor, I couldn't give you [an] exact [date]. It's within the last month." <u>Id</u>. at 818. Neither party could recall whether the document in question had been subject to a discovery order, and out of caution, the court struck the document from evidence. <u>Id</u>. at 843. Later in the hearing on the same day, the court returned to the issue of Exhibit 23. At that time, the court asked the plaintiff to determine if the document was subject to any discovery request, and Mr. Kiely was asked to provide an affidavit explaining when he found the document. <u>Id</u>. at 844. The court advised the parties that "[i]f the discovery request doesn't cover it [Exhibit 23], well, that's a totally different matter. . . ." <u>Id</u>. at 845. The plaintiff was asked to respond by May 16, Mr. Kiely by May 23. <u>Id</u>. at 846. At no point in the hearing on May 7 did the court reference Rule 11 or directly indicate to Mr. Kiely that his conduct might have put him in jeopardy under that rule.

The parties duly replied in May. On June 12, 2003, the court held a telephonic hearing in Washington, D.C., during which the court returned to the document issue. The plaintiff conceded that the document in question, as well as others of like kind, had not been subject to any discovery request. Nor would introduction of the document violate any of the established pretrial procedures for the case. Mr. Kiely's memory as expressed at the May 7 hearing proved to be faulty; he had in fact found what he sought to introduce as Exhibit 23 on the very day of the hearing. The document had apparently been lost among others that had been received in the preceding month.

Mr. Kiely expressed his desire to have Exhibit 23 and one similar document introduced as rebuttal evidence. The court granted that request and provided the plaintiff with the opportunity to respond in writing to the two documents before the court proceeded further. At the close of the June 12 hearing, the court stated: "I want to express my appreciation to both of you for your conduct in this case . . . ." Trial Transcript, June 12, 2003, at 46.

Thus, as of the close of the record, Mr. Kiely had no reason to think that he had engaged in possibly sanctionable conduct by explaining, first in New Orleans and later in Washington, when he found Exhibit 23. A question had arisen about when he became aware of a fact. He supplied his explanation, and even was able to have the document admitted in evidence, and, to boot, he was complimented on his conduct by the judge.

Only by a stretch of imagination is the conduct at issue in the Wallace case sufficient to consider it part of a pattern or even similar to the alleged affirmative misrepresentations with which Mr. Kiely is charged in this case. In the Wallace case,

Mr. Kiely's faulty memory on May 7 was of no consequence, as he successfully explained in his affidavit. His opportunity to "explain himself" was no more than that, as no risk of Rule 11 sanction was ever indicated. The court never indicated to Mr. Kiely that his affidavit was in any way subject to criticism; indeed, the contents of his affidavit carried the day on his desire to have Exhibit 23 introduced and helped to earn him the court's compliment.

In this case, the court justified its failure to have referenced the Wallace case in its show cause order on the ground that it had given Mr. Kiely the opportunity to explain his conduct in the previous case. As demonstrated from the transcripts from the previous case, Mr. Kiely's conduct was never subject to scrutiny under Rule 11. He made a statement in May that he was asked to clarify, and when he did, the whole subject was dropped, and he was complimented.

The legal error in failing to give Mr. Kiely notice of the alleged Wallace case offense is plainly evident from the facts stated above. Had Mr. Kiely been given the opportunity in this case to explain his conduct in the previous case, his explanation would undercut any charge of sanctionable conduct in that case. In the circumstances of this case, at least, Mr. Kiely was entitled to notice that he may have engaged in sanctionable conduct in the Wallace case. We thus conclude that the failure to inform Mr. Kiely in this case that his conduct in the Wallace case provided evidence of a pattern of misconduct constitutes reversible error.

IX

The sanctions order is also reversible on the Court of Federal Claims's assessment of Mr. Kiely's conduct with respect to the government's opposition to the

motion to dismiss its counterclaim. The basis for the court's sanction on this issue is its view that Mr. Kiely misrepresented the knowledge of the government regarding when it first became aware of the grounds for a counterclaim when he asserted that the contracting officer first became aware of the surcharges in February of 2006. The court sanctioned Mr. Kiely for having left the court with the impression that no one in the government was aware of the surcharges before that date.

The case law in this circuit dealing with court imposed sanctions is, thankfully, sparse. Other courts applying the objective reasonableness standard have pointed out that the test "is one of reasonableness under the circumstances." See White v. Gen. Motors Corp., Inc., 908 F.2d 675, 680 (10th Cir. 1990). Context thus matters, as other courts have observed. For example, in Young v. City of Providence, 404 F.3d 3341 (1st Cir. 2005), the court held that counsel could not be charged with misrepresenting a fact to the court when the court itself knew the true facts and thus could not have been misled by the less-than-clear assertions by the party subject to the sanctions order. We thus must test the conclusion of the Court of Federal Claims that Mr. Kiely breached his duty of candor in the context of the pleading in which Mr. Kiely was thought by the court to have misled it.

The motion to dismiss the counterclaim asserted that the counterclaim should be dismissed as an untimely compulsory counterclaim. 1-10 asserted that the government had known of the surcharges for many years, as shown by a copy of a 1996 report contemporaneously received by the Postal Service which, on its face, revealed the existence of the fifteen percent surcharge, and an authorized payment of the bills including the surcharges. From the contents of the motion to dismiss, the government

and the court knew that undisputed evidence showed government knowledge of the surcharges well before the contracting officer learned of them.

The government, in its response, made no attempt to deny its early knowledge of the surcharges, nor did it seek to defend its counterclaim as a compulsory one that could be justified under the safe harbor provisions of RCFC 13(f). Instead, the government argued that its counterclaim had not matured as of the date the government filed its answer to the complaint. The lack of maturity was due to the fact that the contracting officer had not ruled, as of the date of the answer, that the government had a meritorious counterclaim. On the government's theory, its counterclaim did not "exist" for purposes of filing in the Court of Federal Claims until after the ruling of the contracting officer. Because the counterclaim was filed a month after the contracting officer's decision, the government asserted that "there does not exist here any delay such as has caused courts to refuse leave to amend." From the government's perspective, under its RCFC 13(e) counterclaim theory, once its claim had matured for jurisdictional purposes, it had acted promptly.

Mr. Kiely may have been wrong, as a matter of law, in thinking the time taken by the government to mature its counterclaim, as opposed to its diligence after the claim is matured, is irrelevant to a court's discretion to permit a RCFC 13(e) counterclaim to proceed.[1] But being wrong in choice of theory or miscalculation of facts necessary to sustain the theory does not necessarily equate with breach of the duty of candor under RCFC 11. Motown Prods., Inc. v Cacomm, Inc., 849 F.2d 781, 785 (2d Cir. 1998)

---

[1] Given our disposition of this case, we do not decide whether the Court of Federal Claims's construction of RCFC 13(e) was correct.

(observing the distinction that must be drawn between a position which is merely losing and one which is both losing and sanctionable). Here, Mr. Kiely made no affirmative representation of when the government first knew of the basis for a counterclaim, and the court was aware of the uncontested facts showing that the contracting officer was not the first person in the government to know of the surcharges. But Mr. Kiely was sanctioned for omitting a discussion of the same uncontested fact that had been placed in the record by 1-10.

The Court of Federal Claims erred when it read into Mr. Kiely's response an assertion that the contracting officer was the first in government to know of the surcharges. Because the court knew otherwise, it could not have been misled as to the truth, especially since Mr. Kiely's response made no affirmative representation as to the government's first knowledge. A neutral reading of the opposition to the motion to dismiss in the context of the motion itself does not square with the court's decision. On an objective standard, we see no breach of the duty of candor by Mr. Kiely.

For the reasons set forth above, the sanctions order in this case is reversed, and the case is remanded to erase the sanctions against Mr. Kiely.

COSTS

No costs.

REVERSED AND REMANDED