# United States Court of Appeals for the Federal Circuit

---

**DELL FEDERAL SYSTEMS, L.P., BLUE TECH INC., RED RIVER COMPUTER COMPANY, INC.,**
*Plaintiffs-Appellees*

**IRON BOW TECHNOLOGIES, LLC, GOVSMART, INC., IDEAL SYSTEM SOLUTIONS, INC., NCS TECHNOLOGIES, INC.,**
*Plaintiffs*

**v.**

**UNITED STATES, HPI FEDERAL, LLC, CDW GOVERNMENT LLC,**
*Defendants-Appellants*

**ALPHASIX CORPORATION, INSIGHT PUBLIC SECTOR, INC., INTEGRATION TECHNOLGY GROUPS, INC., STERLING COMPUTERS CORPORATION,**
*Defendants*

---

2017-2516, 2017-2535, 2017-2554

---

Appeals from the United States Court of Federal Claims in Nos. 1:17-cv-00465-TCW, 1:17-cv-00473-TCW, Judge Thomas C. Wheeler.

---

SEALED OPINION ISSUED: September 24, 2018
PUBLIC OPINION ISSUED: October 5, 2018*

---

\*    This opinion was originally filed under seal and has been unsealed in full.

———————

CATHERINE EMILY STETSON, Hogan Lovells US LLP, Washington, DC, argued for all plaintiffs-appellees. Plaintiff-appellee Dell Federal Systems, L.P. also represented by MICHAEL F. MASON, THOMAS PETTIT, CHRISTINE ALICE REYNOLDS.

JOSEPH ASHMAN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant United States. Also represented by MARTIN F. HOCKEY, JR., ROBERT EDWARD KIRSCHMAN, JR., CHAD A. READLER; ELINOR KIM, Contract and Fiscal Law Division, United States Army Legal Services Agency, Fort Belvoir, VA.

JONATHAN MICHAEL BAKER, Crowell & Moring, LLP, Washington, DC, argued for defendant-appellant HPI Federal, LLC. Also represented by DANIEL RUBEN FORMAN, ELIZABETH ANN BUEHLER, ROBERT JOSEPH SNECKENBERG.

MICHAEL J. ANSTETT, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, DC, for plaintiff-appellee Blue Tech Inc. Also represented by JAMES J. MCCULLOUGH, BRENDAN CONNOLLY MCNAMARA, NEAHA P. RAOL.

GREGORY R. HALLMARK, Holland & Knight, LLP, McLean, VA, for plaintiff-appellee Red River Computer Company, Inc. Also represented by ELIZABETH JOCHUM, Tysons, VA; RODNEY MITCHELL PERRY, Washington, DC.

DAVID MICHAEL NADLER, Blank Rome LLP, Washington, DC, for defendant-appellant CDW Government LLC.

———————

Before MOORE, SCHALL, and WALLACH, *Circuit Judges.*

WALLACH, *Circuit Judge.*

After initially awarding a contract for computer hardware to original awardees including Dell Federal Systems, L.P. ("Dell"), Blue Tech, Inc. ("Blue Tech"), and Red River Computer Company ("Red River") (collectively, "Appellees"), the U.S. Department of the Army ("the Army") instituted a corrective action[1] to reopen procurement and conduct additional discussions with offerors. J.A. 7009 (Corrective Action). Appellees challenged the decision to institute corrective action before the U.S. Court of Federal Claims, which granted Appellees' cross-motions for judgment on the administrative record and permanently enjoined the Army from proceeding with its corrective action. *See Dell Fed. Sys., L.P. v. United States*, 133 Fed. Cl. 92, 107 (2017); *see also* J.A. 1 (Judgment).

Appellants HPI Federal, LLC ("HPI"), CDW Government, LLC ("CDW"), and the United States ("the Government") (collectively, "Appellants") appeal the opinion and order of the Court of Federal Claims. We possess jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (2012). Because the Court of Federal Claims did not apply the proper legal standard and we determine the Army's corrective action was reasonable under that standard, we reverse.

---

[1] A "corrective action in the bid protest context" is an "agency action, usually taken after a protest has been initiated, to correct a perceived prior error in the procurement process, or, in the absence of error, to act to improve the competitive process." *Dellew Corp. v. United States*, 855 F.3d 1375, 1378 n.2 (Fed. Cir. 2017) (internal quotation marks and citation omitted).

BACKGROUND

I. The Solicitation

In May 2016, the Army solicited proposals for indefinite-delivery, indefinite-quantity contracts for "commercial-off-the-shelf" computer hardware such as desktop computers, tablet computers, and printers under Solicitation No. W52P1J-15-R-0122 ("the Solicitation"). J.A. 1341; *see* J.A. 1339–87. The total estimated contract value was $5 billion over a ten-year period. J.A. 1341. While the Army anticipated "mak[ing] at least eight [contract] awards, with up to five reserved for small business[es]," J.A. 1341, the Solicitation left open the possibility that "the [Army] . . . may make as many, or as few, awards as deemed appropriate," J.A. 1384.

The Solicitation stated that the competition would be conducted in accordance with the procedures outlined in Federal Acquisition Regulations ("FAR") Part 15, "Contracting by Negotiation," and the Army would therefore award contracts to the lowest priced, technically acceptable offerors. J.A. 1384; *see* FAR 15.101-2(a) (2015) (explaining that the "lowest price technically acceptable source selection process is appropriate when best value is expected to result from selection of the technically acceptable proposal with the lowest evaluated price"). The Solicitation further stated offerors would be evaluated based on "an integrated assessment of three evaluation factors" of "Technical Approach, Past Performance, and Price," and any relevant attendant sub-factors. J.A. 1385. To be considered for an award, the Solicitation required offerors to achieve an "'Acceptable' [rating] . . . for the Technical Approach and its two sub-factors and the Past Performance [f]actor." J.A. 1385. For the two Technical Approach sub-factors, offerors were required to complete an attached "Equipment Submission Form" and "Business Process Form" in Microsoft Excel. J.A. 1381–82; *see, e.g.*, J.A. 1388–421 (Equipment Submission Form spreadsheet

template), 1422–25 (Business Process Form spreadsheet template). For the Equipment Submission Form, offerors were instructed to "complete all cell entries" and "identify the Original Equipment Manufacturer (OEM)[] model and salient characteristics of each proposed item," and were advised that "[a]n incomplete or blank entry will indicate that the proposed item does NOT meet minimum requirements." J.A. 1382.

To evaluate the offerors' bids, the Army's evaluation team consisted of a Source Selection Authority ("SSA"), a Source Selection Evaluation Board ("SSEB"), and a Procuring Contracting Officer ("CO"). J.A. 1303. The SSEB would "review and evaluat[e] . . . proposals against the [S]olicitation requirements and the approved evaluation criteria," J.A. 1307, and document their evaluation results in a Source Section Decision Document report, J.A. 5573. Based upon that report, the SSA would either "[m]ake a determination to award without discussions or enter into discussions" and make "the final source selection decision . . . before contracts [were] awarded or announced." J.A. 1304.

The Army reserved the right "to conduct discussions and to permit [o]fferors to revise proposals if determined necessary by the [CO]." J.A. 1379; *see* J.A. 1468 (stating, in an amendment to the Solicitation, "the [Army] intends to award without conducting discussions"); *see also* FAR 15.306(d) (defining discussions as exchanges "undertaken with the intent of allowing the offeror to revise its proposal"). The Solicitation further explained that "[i]f discussions are opened, all proposals, to include small business proposals previously removed for unacceptability[,] . . . will be included. After discussions are closed and final proposal revision[s] are received, the [Army] will separate proposals, re-list[,] and evaluate" in accordance with the procedures for the competition categories, i.e., full and open competition category, and reserved small business category. J.A. 1384.

## II. Source Selection and Award

The Army received fifty-eight proposals, with fifty-two from small businesses. J.A. 5574. Three proposals were rejected as non-responsive, and of the fifty-five proposals that were evaluated, nine were deemed acceptable for the Technical Approach and Past Performance evaluation factors, *see* J.A. 5574; *see also* J.A. 5575–77 (detailing each party's rating for each evaluation factor), with all nine final prices found to be fair and reasonable, *see* J.A. 5579–80. The SSEB said it did "not have a meaningful reason to open discussions" with offerors because doing so "would significantly delay award." J.A. 5534. In February 2017, the Army awarded nine contracts: five contracts under the small business category, including to Blue Tech and Red River, and four under the full and open competition category, including to Dell. J.A. 5573, 5580; *see* J.A. 5579 (identifying which awardees relate to each category).

## III. Post-Award Protests and the Army's Corrective Action

Following the award decision, HPI, CDW, and nineteen other unsuccessful offerors filed protests at the U.S. Government Accountability Office ("GAO"). *See, e.g.*, J.A. 6296–305 (CDW's GAO protest), 6346–427 (HPI's GAO protest). An Army memorandum for record ("MFR"), inter alia, summarizes how the "primary protest allegations" protested the Army's evaluations as unreasonable because the proposal deficiencies the Army considered disqualifying were minor or "clerical errors and misunderstandings" resulting from Solicitation ambiguities that could have been resolved through clarifications as defined in FAR 15.306(a)(2).[2] J.A. 7019; *see, e.g.*, J.A. 6033, 6297. Sever-

---

[2]   Clarifications "are limited exchanges, between the Government and offerors, that may occur when award

al protests also argued that the Army should have engaged in discussions with offerors to resolve these spreadsheet-related misunderstandings, as required by Defense Federal Acquisition Regulations Supplement ("DFARS") 215.306(c),[3] and to resolve claimed misunderstandings relating to the completion of the Excel spreadsheets. *See, e.g.*, J.A. 6367–69; *see also* DFARS 215.306(c)(1) ("For acquisitions with an estimated value of $100 million or more, contracting officers *should* conduct discussions." (emphasis added)).

In response to the GAO protest, the Army conducted an internal review, *see* J.A. 7018, and issued its Notice of Corrective Action, informing GAO that it had decided "that it would be in the Army's best interest to take corrective action to resolve *all* the protests," J.A. 7009 (emphasis added). The Army stated that such corrective action would "consist of the following: (1) opening discussions with all of the remaining offerors, including those who filed protests, (2) requesting final revised proposals, and (3) issuing a new award decision." J.A. 7009.

The Army also released its MFR documenting its rationale for proposing corrective action in light of the GAO protests. *See* J.A. 7018–21 (MFR). First, the CO ex-

---

without discussions is contemplated." FAR 15.306(a)(1). "If award will be made without conducting discussions, offerors may be given the opportunity to . . . resolve minor or clerical errors." FAR 15.306(a)(2).

[3] While the FAR System establishes "uniform policies and procedures for acquisition by all executive agencies," FAR 1.101, the DFARS is the Department of Defense's "implementation and supplementation of the FAR," DFARS 201.301(a)(1), and "is codified under chapter 2 in title 48, Code of Federal Regulations," DFARS 201.303(a)(i).

plained how the Army's counsel found that because the procurement was valued in excess of $100 million, the Army was likely required to conduct discussions with offerors pursuant to DFARS 215.306(c)(1). *See* J.A. 7018−19 (explaining that the SSEB's reasoning of award delay did not constitute a reasonable basis for forgoing discussions); *see also* J.A. 5534 (providing the SSEB's reasoning). Second, counsel found that there was "ambiguity in the requirements or the [Army's] instructions [on] how to fill out the [Equipment Submission Form and Business Process Form Microsoft Excel] spreadsheet[s]," which "could have easily and quickly been resolved" before award and could have been addressed in discussions. J.A. 7020; *see* J.A. 7020 (stating many of the "Unacceptable" ratings were "merely compliance issues with filling out the form rather than a deficiency in the item proposed"). The Army summarized two representative examples of the ambiguities: (1) the presence of a thick, black line "hard-line" in the Equipment Submission Form spreadsheet between the hard-drive and solid-state drive requirements; and (2) the conflicting instructions that "an upgrade [to a base model] *must* be an increase in capability" and "that selection of an item in a drop-down [menu] is acceptable when there are items in the drop-down that are not upgrades to a base model." J.A. 7020; *see, e.g.*, J.A. 386 (depicting the hardline). Ultimately, Army's counsel recommended that "[d]ue to the significant litigation risk, the ambiguities in the spreadsheet . . . , and a matter of policy to do what is right, . . . [the Army] take limited corrective action to resolve the issues with Offerors' Technical Proposals." J.A. 7021.

As a result of the Army's proposed corrective action, the GAO dismissed the unsuccessful offerors' protests as moot. *See* J.A. 7022–23. The Army subsequently notified offerors that "[d]iscussions with all offerors in the competitive range are now open" and invited offerors to present

their "best and final proposal," J.A. 7047 (letter to originally successful offeror), and the Army advised originally unsuccessful offerors to "address the deficiencies in [their] proposal[s]," J.A. 7076, and to revise their final prices "to their best and final prices," J.A. 7077. In addition, "to remedy [any] potential competitive [dis]advantage" to offerors whose prices were disclosed by the original award notice, the Army sent all offerors a Microsoft Excel spreadsheet of the final proposed prices, with offerors not identified. J.A. 7378; *see* J.A. 7379–80 (listing prices).

### IV. The Relevant Proceedings

Two of the nine initial awardees, specifically Dell and Blue Tech, sued the Government in the Court of Federal Claims, seeking to enjoin the Army's corrective action, *see* J.A. 290, and five other initial awardees, including Red River, joined as intervenors, *Dell*, 133 Fed. Cl. at 100.[4] The cases were consolidated. *Id*. The Appellees then sought a permanent injunction, arguing that the corrective action was unlawful, and the proposed corrective action to reopen the competition was not reasonable under the circumstances. *See id.*[5]

In its Opinion and Order, the Court of Federal Claims granted the Appellees' request for declaratory relief and a permanent injunction of the Army's corrective action. *Id*. at 107; *see id.* at 104–07 (analyzing the four-pronged test

---

[4] Because the parties do not dispute the relevant procedural history, *see generally* Gov't's Br.; HPI's Br.; CDW's Br.; Blue Tech's Br.; Dell's Br.; Red River's Br., we cite to the Court of Federal Claims' recitation for convenience.

[5] The Army voluntarily stayed the corrective action pending resolution of the litigation. J.A. 281.

for injunctive relief in favor of Appellees); *see Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (outlining the four-pronged permanent injunction test as (1) success on the merits, (2) irreparable harm, (3) the balance of hardships, and (4) the public interest). As to success on the merits, the Court of Federal Claims determined that, while it agreed that the Army had rationally identified procurement defects, the "Army's contemplated corrective action [wa]s overbroad." *Dell*, 133 Fed. Cl. at 104 (capitalization modified); *see id.* (noting that "the Army rationally identified two procurement defects": (1) "ambiguities in the Equipment Submission Form" and (2) "the Army's failure to hold discussions"); *id.* at 104 (stating that "[e]ven where an agency has rationally identified defects in its procurement, its corrective action must narrowly target the defects it is intended to remedy" (internal quotation marks and citation omitted)), 106 (holding that the Army's corrective action "is not rationally related to any procurement defects"). The Court of Federal Claims also found all three other prongs of the permanent injunction test weighed in favor of Appellees, *id.* at 107, and therefore entered a permanent injunction, J.A. 1.[6]

---

[6]    As to irreparable harm, the Court of Federal Claims found this factor weighed in favor of the Appellees because "[Appellees] would be forced to re[-]compete wholesale for contracts they have already won" and "discussions would also force the [Appellees] to bid against their own prices." *Dell*, 133 Fed. Cl. at 107. As to the balance of hardships, it found that this factor weighed in favor of Appellees because while "[t]he Government would suffer some hardship if it decided to engage in more limited clarification exchanges," "the [Appellees] would face an elevated risk of losing their awards if the Army

DISCUSSION

On appeal, Appellants contend that we should reverse the Court of Federal Claims' grant of a permanent injunction because (1) the Court of Federal Claims applied the wrong standard in considering success on the merits because it assessed whether the Army's proposed corrective action was "narrowly targeted" to remedy a procurement defect, Gov't Br. 21,[7] and (2) under the proper legal framework, "the Army's corrective action is rationally related to the procurement defect," *id.* at 26 (capitalization modified). We begin with the governing standards and then address Appellants' arguments in turn.

I. Standard of Review and Legal Standard

We review "the [Court of Federal Claims'] determination on the legal issue of the government's conduct, in a grant of judgment upon the administrative record, without deference." *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1309 (Fed. Cir. 2016) (citation omitted). We review "[p]rotests of agency procurement decisions . . . under the standards set forth in the Administrative Procedure Act ('APA')." *Id.* (citing 28 U.S.C. § 1491(b)(4)); *see* APA, 5 U.S.C. §§ 551–559, 701–706,

---

were to conduct discussions." *Id.* As to the public interest, the Court of Federal Claims determined that the "public interest favors granting injunctive relief here" because "allowing an agency to respond disproportionately to minor procurement errors harms the integrity of the procurement system" and "introduces an unfair and unanticipated additional layer of competition." *Id.*

[7] Appellants make substantially similar arguments on appeal. *See* Gov't Br. 22; HPI's Br. 15; CDW's Br. 15. For ease of reference, we cite only to the Government's arguments unless otherwise noted.

1305, 3105, 3344, 4301, 5335, 5372, 7521 (2012). The APA provides that "a reviewing court shall set aside the agency action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Croman Corp. v. United States*, 724 F.3d 1357, 1363 (Fed. Cir. 2013) (internal quotation marks and citation omitted); *see* 5 U.S.C. § 706(2)(A). We have held that "[u]nder [the APA] standards, a reviewing court may set aside a procurement action," such as a corrective action, "if (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Centech Grp.*, 554 F.3d at 1037 (internal quotation marks and citation omitted); *see id.* at 1036–37 (treating a corrective action as a type of procurement action).

In evaluating a bid protest case, the Court of Federal Claims "may award any relief that the court considers proper, including declaratory and *injunctive relief*." 28 U.S.C. § 1491(b)(2) (emphasis added). To grant injunctive relief, the Court of Federal Claims "must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp.*, 554 F.3d at 1037 (citation omitted). "We give deference to the Court of Federal Claims' decision to grant or deny injunctive relief, only disturbing the court's decision if it abused its discretion." *PGBA, LLC v. United States*, 389 F.3d 1219, 1223 (Fed. Cir. 2004) (citation omitted). An abuse of discretion exists where the Court of Federal Claims "made a clear error of judgment in weighing the relevant factors or exercised its discretion

based on an error of law or clearly erroneous fact finding." *Id.* (internal quotation marks and citation omitted).[8]

## II. Injunctive Relief

### A. The Court of Federal Claims Abused Its Discretion in Granting a Permanent Injunction Because It Improperly Assessed the Success on the Merits Prong

The Court of Federal Claims summarized the question before it as "whether holding post-award discussions is a rational remedy for failing to hold pre-award discus-

---

[8] Before discussing the merits of the appeal, we first address the threshold issue of jurisdiction. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (recognizing that we have an independent "obligation to satisfy [ourselves] not only of [our] own jurisdiction, but also that of the lower courts"). Pursuant to the Tucker Act, the Court of Federal Claims has bid protest jurisdiction to adjudicate an action by an "interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The Court of Federal Claims had jurisdiction because the Appellees are interested parties that have bid on the Solicitation and have alleged violations of the FAR and DFARS. *See id.*; *see also Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1381 (Fed. Cir. 2012) ("This court has made clear that bid protest jurisdiction arises when an agency decides to take corrective action even when such action is not fully implemented."). We, in turn, have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3) (2012).

sions." *Dell*, 133 Fed. Cl. at 105. It held that "the Army's corrective action is not rationally related to any procurement defects." *Id.* at 106. However, in so holding, the Court of Federal Claims applied a heightened standard, requiring that a reasonable "corrective action must narrowly target the defects it is intended to remedy." *Id.* at 104 (internal quotation marks and citation omitted). The Court of Federal Claims thus enjoined the corrective action because it felt there was "a more narrowly targeted post-award solution that the Army entirely failed to consider: clarifications and reevaluation." *Id.* at 105. Appellants argue that the Court of Federal Claims erred in determining that Appellees had demonstrated success on the merits by employing an incorrect standard. *See* Gov't's Br. 21–22; *see also Dell*, 133 Fed. Cl. at 107. Specifically, Appellants argue that the Court of Federal Claims applied a "more exacting [standard] than the APA's 'rational basis' review threshold for procurement protests, and impermissibly restrict[ed] the great deference the Tucker Act requires courts to afford agency procurement officials" by its use of a "narrowly targeted" standard. Gov't's Br. 22. We agree with Appellants.

The Court of Federal Claims based its decision on an error of law because corrective action only requires a rational basis for its implementation. Although the Court of Federal Claims has previously and occasionally employed a "narrow targeting" test to evaluate the appropriateness of a corrective action, *see, e.g.*, *Amazon Web Servs., Inc. v. United States*, 113 Fed. Cl. 102, 115 (2013) (employing, by the same Court of Federal Claims judge, "narrowly target" language when reviewing a corrective action), "the Court of Federal Claims must follow relevant decisions of the Supreme Court and the Federal Circuit, not the other way around," *Dellew*, 855 F.3d at 1382 (footnote omitted). We have never adopted this heightened "narrowly targeted" standard, as both parties concede. *See* Oral Arg. at 1:26–46, 21:06–19,

http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20
17-2516.mp3.

Instead, we have consistently reviewed agencies' corrective actions under the APA's "highly deferential" "rational basis" standard. *Croman*, 724 F.3d at 1363 (internal quotation marks and citation omitted); *see id.* at 1367 (affirming the Court of Federal Claims' grant of summary judgment in favor of the Government where the agency's corrective action "decisions were rationally based and not contrary to law"); *see, e.g., Raytheon Co. v. United States*, 809 F.3d 590, 595 (Fed. Cir. 2015) (explaining that, "for us to uphold the [agency's] decision to reopen the bidding process, it is sufficient . . . that the grounds relied on by the [agency] . . . *rationally* justified the reopening under governing law" (emphasis added)); *Chapman Law Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934, 938 (Fed. Cir. 2007) (affirming Court of Federal Claims' inquiry, which considered the "reasonableness of the Government's . . . proposed corrective action").[9] The rational basis test asks "whether the contracting agency provided a coherent and reasonable explanation of its

---

[9] Even the Appellees do not dispute that we ultimately determine whether an agency's corrective action lacked a "rational basis" by assessing the reasonableness of the corrective action. *See, e.g.*, Dell's Br. 14 ("To be found reasonable, an agency's corrective action must be rationally related to the defect to be corrected . . . ."); Blue Tech's Br. 21 (similar); Red River's Br. 5 (similar). However, as addressed herein, Appellees dispute the latitude afforded the lower court to apply and narrow the reasonableness analysis. *See, e.g.*, Dell's Br. 18 (disagreeing with the Government's "conten[tion] that [use of] th[e] 'more narrowly targeted' test unduly constrains the Army's discretion" under a court's reasonableness review).

exercise of discretion." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (internal quotation marks and citation omitted); *see id.* at 1355–56 (upholding a "best value" award decision and finding a procurement official acted "within the scope of [his] discretion" in making "a reasonable judgment" to weigh equally a solicitation's "price and technical factors" despite "the solicitation's silence regarding the relationship between the [two]" because "the additional cost of [an unsuccessful bidder's] proposal would not offset its strong technical evaluation").

When determining whether a court committed legal error in selecting the appropriate legal standard, we determine which legal standard the tribunal *applied*, not which standard it recited. *See Int'l Custom Prods., Inc. v. United States*, 843 F.3d 1355, 1359 (Fed. Cir. 2016) (stating that "a single *reference* to an incorrect legal standard does not undermine a final decision, only its *application* does" and holding that, despite referencing an incorrect legal standard, the court under review did not err because it "repeatedly *applied* the correct . . . standard"). Here, although the Court of Federal Claims framed its standard of review and conclusions in terms of rationality and reasonableness, *see Dell*, 133 Fed. Cl. at 101, 105, 106, it actually *applied* a heightened "narrowly targeted" standard, *see id.* at 105–06 (performing a fact-intensive analysis under a heightened "narrowly targeted" review of the Army's corrective action, and finding "there is a more narrowly targeted post-award solution that the Army entirely failed to consider[,] clarifications and reevaluation" "of proposals as a more natural expedient for the minor clerical errors it had identified"). Asking whether a selected remedy is as narrowly targeted as possible to an identified error in the bidding process requires more than a finding of rationality or reasonableness; therefore, the Court of Federal Claims improperly applied an overly stringent test for corrective action. *Cf. Ala. Aircraft*

*Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1376 (Fed. Cir. 2009) (reversing the Court of Federal Claims, where an agency made "a determination well within [its] discretion," but the Court of Federal Claims "attempt[ed] to rewrite the [request for proposals] . . . in the manner the court preferred," such that it "went beyond the scope of the court's [APA] review[] and amounted to an impermissible substitution of the court's judgment for the agency's with regard to how the contract work should be designed").

This error is due in part to the Court of Federal Claims' improper reliance on its decision in *Amazon Web*. *See Dell*, 133 Fed. Cl. at 104. In *Amazon Web,* the Court of Federal Claims held that a corrective action was overbroad, explaining that "even where a protest is justified, any corrective action must narrowly target the defects it is intended to remedy." 113 Fed. Cl. at 115 (citation omitted). The Court of Federal Claims' reliance on *Amazon Web* is incorrect for two reasons. First, as we outlined above, the Court of Federal Claims gave greater weight to the defective legal standard as recited in *Amazon Web* than our holdings in *Chapman*, *Croman*, *Raytheon*, and *Banknote*. Federal Circuit precedent is "binding on this court as it is binding on the Court of Federal Claims." *Crowley v. United States*, 398 F.3d 1329, 1335 (Fed. Cir. 2005). Second, binding precedent aside, *Amazon Web*, in any event, is factually distinguishable. The defects in *Amazon Web* were associated with only the agency's evaluation process, *see* 113 Fed. Cl. at 109, 116, and not with the agency's original solicitation and proposals, as is the case here. Moreover, in *Amazon Web*, the Court of Federal Claims found no rational basis based upon the agency's lack of "a narrowly tailored" corrective action that sought to amend the Solicitation despite no alleged defects with the solicitation or proposals. *See id.* at 116. Here, we have both alleged and undisputed procurement defects, and unlike *Amazon Web*, the Army has not pro-

posed changing its original requirements when reevaluating the offerors' proposals. For these reasons, the Court of Federal Claims improperly relied upon *Amazon Web* to find that the corrective action was not "narrowly targeted" and therefore overbroad and not reasonable.

We disagree with the Appellees' main counterargument that we should view the "narrowly targeted" requirement not as a heightened standard but rather as an application of the rational basis standard. *See* Blue Tech's Br. 24–25; Dell's Br. 16–19. Specifically, Appellees argue that corrective action cases are too "fact specific" for only one agreed-upon application of the legal standard, and they advocate a "reasonable under the circumstances" analysis. Blue Tech's Br. 24 (quoting *WHR Grp., Inc. v. United States*, 115 Fed. Cl. 386, 397 (2014)); *see id.* ("[G]iven the substantial differences . . . from procurement to procurement, 'there can be no universal test as to what constitutes appropriate corrective action.'"); Dell's Br. 19–23 (similar); Red River's Br. 4 (referring to the tests as "two sides of the same coin"). Not only is *WHR Group* a decision of the Court of Federal Claims that is not binding on us, *Dellew*, 855 F.3d at 1382, but *WHR Group* does not support a "narrowly targeted" standard. Instead, *WHR Group* only references in passing various types of evidence used to prove whether the contracting agency had a rational basis for taking a corrective action, such as "a defect in a solicitation," a "legislative reduction of a program," or "legitimate budgetary needs." 115 Fed. Cl. at 397. Adopting the "narrowly targeted" standard would undermine our deferential APA review, which statutorily mandates that we determine "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Banknote*, 365 F.3d at 1351 (internal quotation marks and citation omitted). Because the heightened "narrowly targeted" standard finds no support in the statute or our precedent, we hold that the

Court of Federal Claims erred in applying an incorrect legal standard to review the Army's corrective action.

## B. The Army's Corrective Action Had a Rational Basis

The Court of Federal Claims concluded, inter alia, that despite it being "reasonable" for the Army to "consider[] its failure to conduct discussions to be a procurement defect," the only time to have those discussions was *pre*-award, and therefore reopening procurement *post*-award was overbroad and improper.[10] *Dell*, 133 Fed. Cl. at 103; *see id.* at 106 (stating that "it was [not ]rational for the Army to fail to consider [more narrowly tailored] clarifications and reevaluation of proposals as a more natural expedient for the minor clerical errors it had identified"), *id.* ("The Army instead opened wide-reaching discussions with all remaining offerors and allowed all offerors to submit modified proposals with new prices, despite hav-

---

[10] The parties do not dispute the Court of Federal Claims' finding that procurement defects existed, namely the separate, identified defects of spreadsheet ambiguities and the failure to conduct discussions. *Dell*, 133 Fed. Cl. at 103 ("[I]t was rational for the Army to find defects in the ambiguous spreadsheets . . . [because it] confused offerors and led many of them to input their line item responses incorrectly[,] . . . result[ing in] . . . many offerors [being deemed] technically unacceptable."); *id.* at 104 (stating "it was rational for the Army to find that it may have failed the reasonableness test [previously] articulated [by GAO] when it decided to forgo discussions" in a $5 billion procurement contract in likely violation of DFARS 215.306(c)(1)); *see, e.g.*, Gov't's Br. 18 ("The trial court correctly concluded that the Army reasonably determined that the solicitation was defective . . . ."); Blue Tech's Br. 2 (arguing only that the proposed corrective action is not a "logical correction" to the "defective solicitation").

ing disclosed the [Appellees'] winning prices."). The Government argues that we should reverse the Court of Federal Claims' permanent injunction because the Army's corrective action to reopen procurement was in fact reasonably related to the Solicitation's procurement defects, J.A. 7009, both because such a corrective action is directly and reasonably related to its "likely violat[ion]" of DFARS 215.306(c)(1) by failing to conduct pre-award discussions for a high-valued solicitation, Gov't's Br. 26, and because "clarifications cannot be used to correct material proposal mistakes," *id.* at 30 (capitalization modified). We agree with the Government.

Reviewing the corrective action under the proper legal standard, we hold the Army's original notice of corrective action was reasonable, and through our reversal of the lower court's injunction, this is the corrective action we analyze and reinstate. *See* J.A. 7009 (Notice of Corrective Action). The Army's corrective action "consists of the following: (1) opening discussions with all of the remaining offerors, including those who filed protests, (2) requesting final revised proposals, and (3) issuing a new award decision." J.A. 7009. The Army's proposed corrective action to reopen procurement and allow proposals to be revised is rationally related to the procurement's defects, i.e., failure to conduct discussions and spreadsheet ambiguities. Spreadsheet ambiguities may not always require reopening the procurement process. *See Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1322 (Fed. Cir. 2003) (explaining, for example, that "[r]ather than being 'for the sole purpose of eliminating minor irregularities, informalities, or apparent clerical mistakes,' clarifications now provide offerors 'the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond)'"). However for the other expressly stated defect of

failure to conduct discussions, the only way to conduct discussions as contemplated here is to reopen the procurement process to solicit revised proposals. *See id.* at 1321 ("[D]iscussions involve negotiations[ and] may include 'bargaining,' which 'includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements . . . , or other terms of a proposed contract. A[nd] unlike clarifications, discussions 'are undertaken with the intent of allowing the offeror to revise its proposal.'" (citations omitted)).

Contrary to the Court of Federal Claims' incorrect characterization of the identified spreadsheet defects as "relatively minor," we find that the identified defects in the Solicitation that led to "the majority of the offerors" being disqualified—due to their submission of technically unacceptable offers—were highly material. *Dell*, 133 Fed. Cl. at 104. An offeror's understanding of what computer equipment it may or may not propose is certainly material to this procurement for computer equipment and accessories. The offeror's computer equipment models are the primary technical elements upon which the offerors are being evaluated, *see* J.A. 1388–421, and the ambiguity pertained to filling out the Equipment Submission Form, which allows the offerors to identify their computer equipment, *see* J.A. 386, 7020. Correcting the solicitation ambiguity to allow the offerors to properly identify their equipment, therefore, goes well beyond omitted clerical information.[11]

---

[11] Indeed, the Court of Federal Claims acknowledged that, while "many of the losing offerors in this procurement made minor or clerical errors" allegedly capable of correction through clarifications, *Dell*, 133 Fed. Cl. at 105, there were offerors that made "more wide-

Pursuant to the APA, an agency's actions must be "in accordance with law." 5 U.S.C. § 706(2)(A). Moreover, an agency is bound by the "applicable procurement statutes and regulations." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365 (Fed. Cir. 1999); *see Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 512 (2006) ("An agency has no discretion regarding whether or not to follow applicable laws and regulations."), *aff'd*, 492 F.3d 1308 (Fed. Cir. 2007). Pursuant to DFARS 215.306(c)(1), "[f]or acquisitions with an estimated value of $100 million or more, contracting officers should conduct discussions." Therefore, discussions normally are to take place in these types of acquisitions. *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018) ("The word 'shall' generally imposes a nondiscretionary duty."); *see also Johnson v. McDonald*, 762 F.3d 1362, 1365 (Fed. Cir. 2014) (interpreting a regulation by ascertaining its plain meaning). FAR 2.101 defines "should" to mean "an expected course of action or policy that is to be followed unless inappropriate for a particular circumstance," and the GAO has applied FAR 2.101 to interpret DFARS 215.306(c)(1). *See Sci. Applications Int'l Corp.* (*SAIC*), No. B-413501, 2016 WL 6892429, at *8 (Comp. Gen. Nov. 9, 2016) (finding, in a case of first impression by the GAO, that DFARS 215.306(c)(1) is reasonably read to mean that "discussions are *the expected course of action* in [Department of Defense] procurements valued over $100 million" (emphasis added)). Here, the total procurement is estimated at $5 billion, J.A. 1341, which clearly exceeds the $100 million threshold of DFARS 215.306(c)(1). While it is true that we afford great discretion to a reasonable agency decision, *see Turner Constr. Co. v. United States*, 645 F.3d 1377, 1381 (Fed. Cir. 2011) ("It is well settled that COs are given

---

reaching errors" that were not capable of correction via clarification, *id.* at 106.

broad discretion in their evaluation of bids. When a[ CO's] decision is reasonable, neither a court nor the GAO may substitute its judgment for that of the agency." (citations omitted)), as the Court of Federal Claims recognized, "it was rational for the Army" to determine that the decision "to forgo discussions" with at best "threadbare and conclusory" reasons likely "failed the reasonableness test articulated in *SAIC*," *Dell*, 133 Fed. Cl. at 104; *see* J.A. 7019–20 (citing J.A. 5534). Had the Army conducted pre-award discussions, several of the lower-priced offerors deemed unacceptable—either as a result of ambiguous Solicitation requirements or otherwise—might have revised their initial proposals, which then might plausibly have been found technically acceptable. Opening discussions with all offerors at this stage in the process, as coherently explained here by the Army, *see* J.A. 7019–20, is a reasonable vehicle to allow offerors to propose compliant equipment and modify prices accordingly, *see Banknote*, 365 F.3d at 1351. We determine that the corrective action of conducting discussions is rationally related to the undisputed procurement defect of originally failing to conduct pre-award discussions, as reasonably interpreted by the agency to be required by the applicable regulations, in the first instance. *See* J.A. 7019–20.

The Appellees contend that the Army's decision to conduct discussions was an unreasonable corrective action, "even assuming the [Court of Federal Claims] applied the 'wrong standard.'" Blue Tech's Br. 27 (capitalization modified). Specifically, they argue the action was unreasonable because the defects were identified *after* the initial award decisions were made, in effect arguing that the reasonableness inquiry is different in the pre- and post-award context. *See id.* at 27–28 ("[T]he posture of this procurement is fundamentally different from what it would have been had the Army engaged in discussions *before* announcing nine of the offerors' proposed prices."); Dell's Br. 30 ("Even accepting that the Army should have

held discussions *earlier* in the process, it does not follow that the proper remedy for that error is to hold far-reaching discussions *now*."); Red River's Br. 8 ("While failure to conduct pre-award discussions could be properly remedied by conducting discussions before the awards were announced and the awardees' prices disclosed, the same is not true in the post-award environment."). However, the Appellees cite no precedent, nor do we find any, to support the imposition of a pre- and post-award dichotomy in our reasonableness analysis for corrective action. Since opening discussions was a reasonable corrective action, *see supra*, pursuant to the express terms of the Solicitation, "[i]f discussions are opened, all proposals, to include small business proposals previously removed for unacceptability . . . will be included," J.A. 1384. We do not disrupt on appeal the Army's adherence to the terms of the Solicitation in implementing its corrective action to open discussions. *See Croman*, 724 F.3d at 1363 (reviewing the agency's corrective action pursuant to a "highly deferential" standard (internal quotation marks and citation omitted)).

While the Appellees take issue with alleged anti-competitiveness of the Army's release of all offerors' pricing in order to maintain fairness in the corrective action rebidding, *see* Blue Tech's Br. 28; Dell's Br. 31–32; Red River's Br. 5, this does not alter our analysis. Here, the relevant timeline of events lends itself to a unique procedural posture. After the Army notified all offerors of the award, it sent debriefing letters in February 2017 to the unsuccessful offerors "in accordance with FAR 15.506." J.A. 5949; *see, e.g.*, J.A. 5948–49 (Debriefing Letter to HPI). FAR 15.506 sets forth the required deadlines for "[p]ost[-]award debriefing of offerors" and provides that upon written request by any offeror "within 3 days after the date on which that offeror has received notification of contract award," *see* FAR 15.506(a)(1), an agency must, within five days, *see* FAR 15.506(a)(2),

debrief said offerors as to, inter alia, the prices of the "*successful* offeror," FAR 15.506(d)(2); *see* FAR 15.506(d) (outlining the "minimum" required post-award debriefing information). However, in this case, a month later and after protests were filed at the GAO, as discussed *supra*, *see* Background Section III, the Army conceded that procurement defects occurred, and it decided to proceed with its corrective action to open discussions following GAO approval, *see* J.A. 7021 (MFR dated March 22, 2017). Then, on March 27, 2017, during the course of discussions and "[a]s part of the . . . corrective action, the [Army] . . . decided to release all offerors' total proposed prices in an effort to remedy the potential competitive advantage held by the offerors in the competition whose prices were not disclosed." J.A. 7378; *see* J.A. 7379–80 (listing total bid prices for all fifty-five offerors whose bids were deemed responsive).

We find no binding authority preventing, on the facts of this case, the release of the pricing information of all offerors. Moreover, we find that the Government provides a reasonable explanation for its actions. Under these circumstances, the Government concluded it would, upon rebidding, level the playing field for those successful offerors who did not propose the lowest price and now deserve a chance to revise their proposals to fairly compete during the rebidding process. *See* Oral Arg. at 8:54–9:51 (Q: "It seems that the Army . . . decided in fairness that since [offerors] now have a target to shoot at—namely, they now know what the awardee listed for everything, so they know how to come in under it— [did] it seem[] only fair . . . to list everyone else's [prices]?" A: "Yes, your Honor . . . . In this case, . . . the initial awardees, they were not the lowest priced offerors. So, if the offerors who were not initially technically acceptable, they get a chance to revise their proposals, the initial awardees may likely be pushed out of the competition." Q: "When they did release all of the numbers that each

person gave in the proposal, did they strip [the] name[s] of the proposer?" A: "That's right your Honor."). We find this to be reasonable action in light of a defective procurement, which the parties concede was defective. *See supra* n.10; *see also* Oral Arg. at 29:57–30:07 (conceding, by Dell's counsel, that "[w]e won the procurement submitting a technically acceptable offer, . . . [but] to a defective procurement").

The FAR explains that, when conducting discussions, "[a]t a minimum, the [CO] must . . . indicate to, or discuss with, each offeror still being considered for award, [inter alia,] deficiencies" in the offeror's proposal "to which the offeror has not yet had an opportunity to respond." FAR 15.306(d)(3). The Army only proposes to allow an offeror to "address deficiencies in [their] proposal" and "make revisions to correct the deficiencies listed" by the Army. J.A. 7097 (noting in letter opening discussions with offeror that "[i]f you make changes to areas of your technical proposal that have already been found acceptable, you are at risk of being found technically unacceptable"). Given these reasonable limitations, the corrective action has a rational basis.

Nevertheless, the Appellees maintain that clarifications are the only reasonable corrective action. *See, e.g.*, Dell's Br. 29, 31. However, requests for clarifications are "limited exchanges," designed to "clarify certain aspects of proposals" or "resolve minor or clerical errors" in the offerors' proposals. FAR 15.306(a)(1)–(2). "Clarifications are not to be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, or otherwise revise the proposal." *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 661 (2002) (brackets and citation omitted), *aff'd*, 56 F. App'x 474 (Fed. Cir. 2003). As discussed above, the errors caused by the ambiguities in the Equipment Submission Form were material, rather than minor or clerical. The Court of Federal Claims acknowledged as much when it stated

that while "many of the losing offerors in this procurement made minor or clerical errors" allegedly capable of correction through clarifications, *Dell*, 133 Fed. Cl. at 105, there were offerors that made "more wide-reaching errors" that were not capable of correction via clarification, *id.* at 106. Thus, the Army rationally chose discussions, rather than clarifications, for all offerors as the appropriate corrective action to address these material errors, especially due to the Solicitation's requirement to include, *should* the Army decide to open discussions, "all proposals, to include small business proposals previously removed for unacceptability." *See* J.A. 1384; *Alfa*, 175 F.3d at 1368 (holding that an "agency is strictly bound by [the] terms" of the standards set out in the *solicitation*).[12]

_____

[12] The Appellees also contend that our precedent in *Systems Application* counsels against reinstating the Army's selected corrective action because "post-award corrective action that allows previously unsuccessful offerors to revise their proposals after the awardee's price has been disclosed causes harm to the original awardees." Red River's Br. 4–5 (citing *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374 (Fed. Cir. 2012)). Reliance on *Systems Application* is improper here because that case analyzed whether a protestor suffered an injury-in-fact to have standing, *see* 691 F.3d at 1382–83, which is not at issue here. And unlike in *Systems Application*, the Court of Federal Claims here found the Army's decision to take corrective action (despite disagreeing with the proposed corrective action) was justified due to likely violating a regulation. *Dell*, 133 Fed. Cl. at 103–04; *see id.* at 104 ("Therefore, it was rational for the MFR to find that the Army's failure to conduct discussions constituted a procurement defect.").

Finally, Appellees argue that the Army's failure to consider other "[m]ore [l]imited" corrective actions is arbitrary and capricious. Dell's Br. 33. The Army was not legally required to address every option, but rather to provide a reasonable corrective action and adequately explain its reasoning for doing so. *See Chapman*, 490 F.3d at 938. The Army rationally decided to ameliorate a defective solicitation by re-opening the procurement, following the applicable regulation, and engaging in discussions to award new contracts. Even if we agreed with Appellees that the Army had other, better options available, we nevertheless conclude that the option it chose was reasonable, and we therefore refuse to "substitute [our] judgment" for that of the Army by determining whether there was another, perhaps preferable solution. *See R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003) ("[W]hen an officer[']s decision is reasonable a court may not substitute its judgment for that of the agency.").

Accordingly, we hold that the original corrective action was rationally related to the procurement defect and that the Court of Federal Claims abused its discretion in finding that Appellees demonstrated, inter alia, success on the merits. Because proving success on the merits is a necessary element for a permanent injunction,[13] we

---

[13] We may balance the remaining three *Centech* permanent injunction factors—irreparable harm, balance of hardships, and public interest—when deciding whether to grant or deny injunctive relief; however, because we find the Court of Federal Claims erred in finding that the Appellees had "succeeded on the merits," the great weight we accord this factor as compared to the other three precludes the possibility of an injunction. *See Centech Grp.*, 554 F.3d at 1037; *see also Hallmark-Phoenix 3, LLC*

reverse the Court of Federal Claims' grant of an injunction. The Army may proceed with its proposed corrective action, which we hereby reinstate.

## CONCLUSION

We have considered the parties' remaining arguments and find them unpersuasive. Accordingly, the Judgment of the U.S. Court of Federal Claims is

## **REVERSED**

---

*v. United States,* 429 F. App'x 983, 984 (Fed. Cir. 2011); *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 953 (Fed. Cir. 1990) ("If the injunction is denied, the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial."). Moreover, we find that Appellees cannot meet their burden to justify a permanent injunction even if the three remaining permanent injunction factors balanced together in equilibrium, and therefore reversal is appropriate here because any alternative result on remand necessarily would have been an abuse of discretion. *Cf. Robert Bosch LLC v. Pylon Mfg. Corp.,* 659 F.3d 1142 (Fed. Cir. 2011) (weighing permanent injunction factors and reversing instead of remanding a lower court's decision to deny a permanent injunction).