# United States Court of Appeals for the Federal Circuit

---

**OAK GROVE TECHNOLOGIES, LLC,**

*Plaintiff-Appellee*

**v.**

**UNITED STATES, F3EA, INC.,**

*Defendants-Appellants*

---

2022-1556, 2022-1557

---

Appeals from the United States Court of Federal Claims in No. 1:21-cv-00775-MHS, Judge Matthew H. Solomson.

---

OPINION ISSUED:  September 11, 2024
OPINION MODIFIED: September 16, 2024[*]

---

CRAIG HOLMAN, Arnold & Porter Kaye Scholer LLP, Washington, DC, argued for plaintiff-appellee.  Also represented by THOMAS PETTIT.

WILLIAM JAMES GRIMALDI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant

---

[*]   This opinion has been modified and reissued to correct typographical errors on page 2.

United States.  Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, DOUGLAS K. MICKLE, JOSEPH ALAN PIXLEY; MICHAEL RAY TREGLE, JR., Contract Litigation & Intellectual Property Division, United States Army Legal Services Agency, Fort Belvoir, VA.

JOSHUA ALLAN MULLEN, Womble Bond Dickinson (US) LLP, Nashville, TN, argued for defendant-appellant F3EA, Inc.  Also represented by RAYMOND BENNETT, Raleigh, NC.

—————————————

Before PROST, STOLL, and STARK, *Circuit Judges*.

STARK, *Circuit Judge*.

This bid protest action originated with the United States Department of the Army ("Army" or "agency") awarding a contract to F3EA, Inc. ("F3EA").  Another bidder, Oak Grove Technologies, LLC ("Oak Grove"), protested the award, including by filing suit in the Court of Federal Claims.  The Court of Federal Claims agreed with Oak Grove that the bidding process had gone awry and, therefore, enjoined the Army from proceeding with its award to F3EA.  It further ordered the Army either to begin the procurement process anew or reopen it to conduct discussions with, and accept revised final proposals from, multiple offerors, including Oak Grove.  The trial court also sanctioned the government for repeatedly failing to include material evidence in the administrative record.  Both F3EA and the government appeal the trial court's judgment and the injunction.  The government additionally appeals the trial court's sanctions order.  We vacate the judgment and the injunction, affirm the sanctions order, and remand for further proceedings.

I

A

The contract at issue here is called "Special Operations Forces Requirements, Analysis, Prototyping, Training, Operations and Rehearsal," or "SOF RAPTOR." J.A. 2650. As the name implies, SOF RAPTOR is a contract vehicle that the Army uses for procuring training services for its special forces. When the predecessor contract to the one at issue here was set to expire, the Army issued a solicitation ("Solicitation," "Request for Proposals," or "RFP") for SOF RAPTOR IV, a small business set-aside, single-award, indefinite delivery indefinite quantity ("IDIQ") contract with an order ceiling of $245 million. In the Solicitation, the Army required offerors to include in their proposals four volumes addressing the following factors: (1) capability, (2) past performance, (3) cost/price, and (4) administrative. *See* J.A. 2764-65. The Solicitation provided that the capability, past performance, and cost/price volumes would be evaluated in that order of importance. *See* J.A. 2778. The Solicitation did not include any criteria for evaluating the "administrative" volume. The government indicated that, in evaluating proposals, it "may use information other than that provided by Offeror in its evaluation . . . includ[ing] DCAA [Defense Contract Audit Agency], DCMA [Defense Contract Management Agency], Government Databases and past performance questionnaires." J.A. 2777.

The Solicitation explained that the capability factor included three technical subfactors, and that a rating of "unacceptable" or "marginal" in any of the three subfactors would result in an "unacceptable" or "marginal" rating for the overall capability factor, rendering a proposal "unawardable." J.A. 3547-48. The "program management subfactor" required the offeror to demonstrate the ability to address, among other things, "[m]anagement [s]tructure," J.A. 2766, 2778. In connection with "[m]anagement [s]tructure," an offeror was required to "identify all

teaming arrangements, partnerships, joint venture owner-ship and contingencies, as applicable, within this description." *Id.*

Relatedly, the Solicitation required offerors to submit "all executed teaming arrangements" and provided that "any previous teaming arrangements . . . that [are] referenced within the proposal shall be included as attachments in the admin volume as supporting documentation." J.A. 2775. The Solicitation also stated that "any modifications to a teaming arrangement must be reviewed by the Contracting Officer before the effective date of such modification in order to ensure that there [are] no negative impacts on contract performance, in accordance with FAR [Federal Acquisition Regulation] 9.603." J.A. 2771. As relevant here, FAR § 9.603 provides that "[t]he Government will recognize the integrity and validity of contractor team arrangements; *provided*, the arrangements are identified and company relationships are fully disclosed in an offer or, for arrangements entered into after submission of an offer, before the arrangement becomes effective."

Past performance was evaluated for relevancy (i.e., "Very Relevant," "Relevant," "Somewhat Relevant," or "Not Relevant") and confidence (i.e., "Substantial Confidence," "Satisfactory Confidence," "Neutral Confidence," "Limited Confidence," or "No Confidence"). J.A. 2784-85. For Cost/Price factor, the Solicitation specified that the "DCAA will be requested to perform a Financial Capability Risk Assessment for the Prime offeror" and that "[t]he Prime offeror must be deemed financially responsible by the Contracting Officer based on the Financial Capability Risk Assessment." J.A. 2783. As relevant here, FAR § 9.103(a) provides that "[p]urchases shall be made from, and contracts shall be awarded to, responsible prospective contractors only." Because SOF RAPTOR IV is a small business set-aside contract, FAR § 9.105-2(a)(2) also requires that "[i]f the contracting officer determines that a responsive small business lacks certain elements of responsibility,"

the contracting officer shall "[r]efer the matter to the cognizant SBA [Small Business Administration]," FAR § 19.602-1(a)(2). Once the SBA assesses the financial responsibility of the small business, FAR § 9.105-2(a)(2) requires "the contracting officer [to] accept the Small Business Administration's decision to issue a Certificate of Competency and award the contract to the concern."

## B

Oak Grove, F3EA, and Lukos-VATC III, LLC ("Lukos") were among the ten offerors that timely submitted proposals to be awarded the SOF RAPTOR IV contract. Oak Grove and F3EA were both members of Raptor Training Services, LLC, a joint venture that had been awarded the predecessor contract, SOF RAPTOR III.

The Army initially screened proposals to ensure that all necessary information was submitted. Later, source selection evaluation board ("SSEB") teams were assigned to evaluate and rate proposals. A person identified as "RM" was the chairperson of the overall SSEB and, in that capacity, RM received all reports from various teams within the SSEB. *See* J.A. 2700 (showing source selection team structure); J.A. 2690-91 (outlining roles and responsibilities of SSEB). RM, as chairperson, was responsible for preparing a comprehensive and accurate proposal evaluation report ("PER"), containing "the adjectival assessments for each factor and subfactor as well as a Cost/Price report and the supporting rationale." J.A. 6 (citation omitted). The PER was provided to the source selection advisory council ("SSAC"), which, in turn, provided the source selection authority ("SSA") with a source selection decision recommendation. The SSA was an individual designated to make the best-value source selection decision.

Ultimately, the Army awarded the SOF RAPTOR IV contract to F3EA after rating F3EA's proposal as having the highest technical rating and the lowest price among the three proposals that received an acceptable (or better)

capability rating.  Specifically, the Army rated F3EA's proposal, which had a price of $4.35 million, as "Outstanding" in each capability subfactor and assigned it a "Very Relevant" and "Substantial Confidence" rating for past performance.  J.A. 3587.  By comparison, Lukos' proposal, which had a higher price of $4.78 million, was rated only "Good" for the capability factor and "Somewhat Relevant" and "Neutral Confidence" for past performance.  J.A. 3588.  Oak Grove's proposal was deemed unawardable because the agency rated it "Unacceptable" for the capability factor.  J.A. 3587.

C

Shortly after the SOF RAPTOR IV contract was awarded to F3EA, Oak Grove filed a protest with the Government Accountability Office ("GAO"), raising numerous challenges to the Army's evaluation of Oak Grove's own proposal and to the Army's decision to award the contract to F3EA.  Among Oak Grove's allegations was that F3EA improperly benefited from unequal access to information, resulting in a prohibited organizational conflict of interest ("OCI").  As support for its accusation, Oak Grove submitted two emails it had received from former F3EA employees.  In those emails, the employees alleged that they had overheard conversations between an employee of F3EA and RM, the chairperson of the SSEB, regarding "the intent for F3EA to get the work," J.A. 1546 (internal quotation marks omitted), and that RM had steered the contract award to F3EA by deliberately selecting the sample task orders ("STO") that F3EA had performed under the predecessor SOF RAPTOR III contract, J.A. 1620-21.  Oak Grove also alleged that F3EA had a role in drafting the STOs.  Shortly after filing its protest at the GAO, Oak Grove sent a notice of possible Procurement Integrity Act ("PIA") violations to the contracting officer.

Soon thereafter, the Army issued a notice of corrective action, stating:

> The Army will reevaluate proposals consistent with the solicitation, determine the impact of the reevaluations on the source selection decision, and document its reevaluations and new best value determination. . . . Additionally, the Army has initiated an investigation in accordance with FAR 9.505 to determine the validity of the organizational conflict of interest (OCI) allegations in Oak Grove's protest. The Army will also investigate the allegations set forth in Oak Grove's January 29, 2020 Notice of Possible Procurement Integrity Act Violations in accordance with FAR 3.104. The Army will take appropriate action as necessary based on the results of the information gathered during the investigation.

J.A. 1623. The GAO then dismissed Oak Grove's protest, finding that "[t]he agency's corrective action render[ed] the protest academic." J.A. 1625.

On February 18, 2020, the contracting officer issued a memorandum summarizing the findings from the investigation he had undertaken of Oak Grove's OCI and PIA allegations. As part of that investigation, members of the SSEB provided written statements and were interviewed, uniformly denying that they had ever heard RM discussing influencing the procurement for the benefit of F3EA. The contracting officer also obtained a written statement from RM, also denying Oak Grove's allegations. Neither RM nor the former F3EA employees who had sent the emails on which Oak Grove's allegations rested were interviewed. On May 1, 2020, the contracting officer issued another memorandum, noting that the emails from the former F3EA employees "did not provide a timeline of when the statements and discussions [involving RM] occurred, the topics of discussion and who were other parties that were present." J.A. 3441. Based on the findings of the

investigation, the contracting officer ultimately concluded that Oak Grove's allegations were not credible and that the alleged OCI and PIA violations could not be substantiated.

On August 28, 2020, after reevaluating the proposals, the Army once again awarded the SOF RAPTOR IV contract to F3EA, having concluded once more that F3EA was the offeror having the highest technical rating and the lowest price at $4.35 million.  Lukos' proposal, which had a price of $4.73 million, was rated "Good" for the capability factor and "Relevant" and "Satisfactory Confidence" for past performance.  *Id.*  Proposals from the remaining offerors, including Oak Grove, were deemed unawardable because the agency rated them "Marginal" or "Unacceptable" for the capability factor.

On September 9, 2020, Oak Grove filed a second protest with the GAO, raising the same issues it had presented in the first protest.  On December 18, 2020, the GAO denied the protest, concluding that the agency was reasonable in assessing Oak Grove's proposal as unawardable.  *See* J.A. 3677.

D

On January 21, 2021, Oak Grove filed its complaint against the United States in the Court of Federal Claims. The complaint alleged that the agency: (1) inadequately investigated whether the chairperson, RM, steered the procurement award to F3EA (Count I); (2) awarded the contract to F3EA despite the existence of biased ground rule or unequal information OCIs (Count II); (3) violated FAR § 1.602-2 and FAR § 3.101-1 (Count III), which require the government and its contracting officers to avoid any conflict of interest in Government-contractor relationships and to treat contractors impartially, fairly, and equitably; (4) abused its discretion in failing to engage in discussions or clarifications with Oak Grove (Count IV); (5) arbitrarily assessed weaknesses to various sections of Oak Grove's proposal (Counts V-VIII); (6) misevaluated Lukos'

proposal (Count IX); and (7) awarded F3EA the contract despite various critical deficiencies with its proposal (Counts X-XII). J.A. 9. F3EA intervened.

The Court of Federal Claims granted Oak Grove's motion for judgment on the administrative record and enjoined the Army from proceeding with its contract award to F3EA. It wrote:

> Given the defects in F3EA's and Lukos' respective proposals . . . , the Agency's failure to conduct discussions, as well as the Agency's inadequate investigation into alleged wrongdoing by the [chairperson, RM], the [c]ourt concludes that it has no choice but to order the Agency either: (1) to resolicit this procurement from its inception; *or* (2) to reopen the procurement to conduct discussions and accept new final proposal revisions from offerors.

J.A. 51. The trial court also denied the government's motion to dismiss Oak Grove's complaint for lack of standing.

## E

In a separate order, the Court of Federal Claims sanctioned the government under Rule 11 of the Rules of the United States Court of Federal Claims ("RCFC") for failing to compile a complete administrative record. Over the course of the litigation, the trial court had directed the government, on numerous occasions, to file certain documents that had been omitted from the administrative record originally filed by the government. *See* J.A. 735-36, 1017-18, 1114-15. Among them were a letter from the SSA terminating RM's appointment as SSEB Chairperson, J.A. 3950, and a report from the DCMA recommending "No Award" for Lukos based on its financial capability, which the court found to be highly relevant to the issues in the litigation. J.A. 3937-39; *see also* J.A. 67, 70, 80. As sanctions for its

failings, the government was ordered "to pay the legal costs and expenses [Oak Grove] incurred in dealing with the administrative record issues for which the government was responsible throughout this litigation." J.A. 81.

### F

The government and F3EA timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

### II

We review the Court of Federal Claims' "determination on the legal issue of the government's conduct, in a grant of judgment upon the administrative record, without deference." *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1309 (Fed. Cir. 2016) (internal quotation marks and citation omitted). "This means that we apply the arbitrary and capricious standard . . . anew." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (internal quotation marks omitted). We review determinations of standing under the Tucker Act de novo. *See SEKRI, Inc. v. United States*, 34 F.4th 1063, 1070 (Fed. Cir. 2022). However, underlying factual findings, including prejudice, are reviewed for clear error. *See CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1357-59 (Fed. Cir. 2018); *see also Bannum, Inc. v. United States*, 404 F.3d 1376, 1357 (Fed. Cir. 2005) ("[T]he trial court's factual determination on prejudice . . . is entitled to review for clear error like any finding in a bench trial, and the special concerns applicable to bid protest actions do not alter that review here.").

The Administrative Procedure Act ("APA") supplies the standard of review in bid protests. *See* 28 U.S.C. § 1491(b)(4); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009). The APA standard asks whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).

Hence, the court may overturn the challenged agency decision if it "lacked a rational basis" or "involved a violation of regulation or procedure." *Axiom*, 564 F.3d at 1381 (internal quotation marks and citation omitted).

In handling a bid protest case, the Court of Federal Claims "may award any relief that the court considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2).  Before granting injunctive relief, the trial court "must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp.*, 554 F.3d at 1037.  "We give deference to the Court of Federal Claims' decision to grant or deny injunctive relief, only disturbing the court's decision if it abused its discretion." *PGBA, LLC v. United States*, 389 F.3d 1219, 1223 (Fed. Cir. 2004).  An abuse of discretion exists where the court has "made a clear error of judgment in weighing the relevant factors or exercised its discretion based on an error of law or clearly erroneous fact finding." *Id.* (internal quotation marks and citation omitted).

Accordingly, here, we review without deference the Court of Federal Claims' analysis of whether the Army's evaluations of the offers were arbitrary and capricious. However, we review the court's holding that Oak Grove was prejudiced by these evaluations for clear error. We review the imposition of sanctions for abuse of discretion.

## III

The parties raise numerous procedural and substantive arguments.  With respect to procedure, Oak Grove argues that the government's corrective action renders this appeal moot, while F3EA and the government contend that Oak Grove lacks standing because it has not been prejudiced.  We reject each of these positions. After doing so, we

turn to the substantive issues.  We agree with F3EA and the government that the Army's award to F3EA was not arbitrary and capricious, rejecting Oak Grove's contentions that (1) the agency was required to hold discussions, an issue we do not resolve on the merits because Oak Grove waived its argument, (2) F3EA was required to include teaming agreements in its proposal, and (3) the agency's investigation into RM's alleged misconduct was inadequate.  We further agree with F3EA and the government that the trial court erred in finding that Lukos' proposal was ineligible for award.  Finally, we disagree with the government's contention that the Court of Federal Claims abused its discretion by imposing Rule 11 sanctions.

## A

### 1

We begin by explaining our rejection of Oak Grove's suggestion that this appeal is moot.  Oak Grove's mootness contention is grounded in the fact that after the Court of Federal Claims entered judgment, the government reopened the procurement, engaged in discussions with certain offerors, requested and evaluated revised proposals, and reopened its investigation into the SSEB's chairperson's alleged misconduct.  However, as the government points out – without dispute from Oak Grove – the Army "has no[t] issued any new contract nor has the agency resolicited its requirements."  Gov't Reply Br. at 2.  Thus, if F3EA and the government prevail on appeal, the Army may be "in a position to reinstate[] the original award [to F3EA], which would obviate any need to continue its contingent corrective action."  *Id.* at 3.  Additionally, absent this appeal, the government would have no mechanism to attempt to overturn the sanctions order.  Because both F3EA and the government could be in better positions if they press and prevail on appeal than if there could be no appeal, their appeals are not moot, notwithstanding the government's corrective actions.  *See Acceleration Bay LLC*

*v. 2K Sports, Inc.*, 15 F.4th 1069, 1076 (Fed. Cir. 2021) ("The test for mootness is whether the relief sought, if granted, would make a difference to the legal interests of the parties . . . .") (internal quotation marks and citation omitted).

## 2

A second preliminary procedural issue is whether Oak Grove has standing to press its bid protest claims. Because we find no clear error in the Court of Federal Claims' factual finding that Oak Grove was prejudiced by the agency's procedure, we do not agree with F3EA and the government that Oak Grove lacks standing.

Under the Tucker Act, the Court of Federal Claims has jurisdiction over cases brought "by an interested party objecting to . . . the award of a contract" by a federal agency. 28 U.S.C. § 1491(b)(1). "To satisfy § 1491(b)(1)'s standing requirements," the plaintiff "must make two showings." *CliniComp*, 904 F.3d at 1358. First, the plaintiff "must show that it is an 'interested party.'" *Id.* An "interested party" objecting to a contract award is an "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (internal quotation marks and emphasis omitted). "[T]o prove a direct economic interest," such a plaintiff "must show that it had a substantial chance of winning the contract." *CliniComp*, 904 F.3d at 1358. In this way, the "interested party" requirement – which is statutory, not jurisdictional – "imposes more stringent standing requirements than Article III." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009); *see also CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023).

"Second, the plaintiff must show that it was prejudiced by a significant error in the procurement process." *CliniComp*, 904 F.3d at 1358. The requirement to show

prejudice, like the "interested party" requirement, is statutory and not jurisdictional. *See CACI*, 67 F.4th at 1153 ("[T]he issue of prejudice is no longer jurisdictional unless it implicates Article III considerations."). "To establish prejudice," a plaintiff objecting to a contract award "must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003).

For purposes of evaluating standing, "[i]n assessing whether a party was prejudiced by purported errors in a procurement process, we must assume that the party will, if permitted to proceed with its claim, prevail on the merits." *REV, LLC v. United States*, 91 F.4th 1156, 1164 (Fed. Cir. 2024). Hence, in undertaking the standing analysis here, we must presume that Oak Grove will prevail on its challenges to the Army's evaluation of F3EA's and Lukos' proposals. Thus, we must evaluate whether Oak Grove would have had a substantial chance of receiving the contract in a scenario in which Oak Grove has succeeded in proving that neither F3EA nor Lukos submitted compliant, awardable proposals.

From this perspective, we find no clear error in the Court of Federal Claims' finding that, in that eventuality, Oak Grove is an interested party and would have had a substantial chance of being awarded the SOF RAPTOR IV contract. If F3EA and Lukos were eliminated, as Oak Grove alleges they should have been, the Army would have been obligated to seek and consider revised proposals from other offerors that were initially deemed unawardable, including Oak Grove. *See Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1359 (Fed. Cir. 2015) ("[A] bid protester had a 'substantial chance' of receiving a contract – and therefore standing to challenge the award of that contract – if, as a result of a successful bid protest, the government would be obligated to rebid the contract and the protester could compete for the contract during the

reopened bid."). Assuming, as we must, that its challenges to F3EA and Lukos would be successful, Oak Grove would be provided an opportunity to submit a revised proposal, giving it a chance to cure the deficiencies in its original "un-awardable" proposal and, hence, would have a "substantial chance" of being awarded the contract.

Accordingly, the trial court's finding that Oak Grove demonstrated a substantial chance of being awarded the contract – and, for purposes of the standing analysis, was an interested party and prejudiced – is not clearly errone-ous. *See* J.A. 13. Thus, Oak Grove had standing to chal-lenge the awardability of F3EA and Lukos. We affirm the Court of Federal Claims' denial of the government's motion to dismiss for lack of standing.

## B

Having disposed of the procedural issues raised by the parties, we now turn to their substantive arguments. F3EA and the government contend that the Army did not act arbitrarily and capriciously in finding F3EA's proposal acceptable. Specifically, F3EA and the government argue that (1) Oak Grove waived its argument that the agency was required to hold discussions and, in any case, discus-sions were not required, (2) F3EA was not required to in-clude a teaming agreement in its proposal, and (3) the agency's investigation into RM's alleged misconduct was adequate. F3EA and the government additionally argue that the trial court erred by finding Lukos' proposal unac-ceptable. We agree with F3EA and the government on each of these points.

## 1

First, we address F3EA's and the government's argu-ment that the Army did not act arbitrarily and capriciously in awarding the contract to F3EA without first engaging in discussions with offerors. On de novo review, we conclude Oak Grove waived this issue, consistent with our holding

in *Blue & Gold, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).

In *Blue & Gold*, 492 F.3d at 1313, we held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." The applicability of the "*Blue & Gold* rule" turns on the existence of a patent error. "A defect in a solicitation is patent if it is an obvious omission, inconsistency, or discrepancy of significance. Additionally, a defect is patent if it could have been discovered by reasonable and customary care." *Inserso Corp. v. United States*, 961 F.3d 1343, 1349 (Fed. Cir. 2020) (internal citation omitted). Thus, the issue we confront is whether the error alleged by Oak Grove is obvious or could at least have been discovered by reasonable and customary care.

Oak Grove asserts that the Army violated Defense Federal Acquisition Regulation Supplement ("DFARS") § 215.306(c), which provides that "[f]or acquisitions with an estimated value of $100 million or more, contracting officers *should* conduct discussions" (emphasis added). Regardless of the merits of this argument, the Army's intent not to conduct discussions – and, thus, the alleged violation of the DFARS provision – is obvious from the Solicitation and certainly could have been discovered by Oak Grove through the exercise of reasonable and customary care. Indeed, multiple portions of the Solicitation informed the bidders that discussions would not be held, including the Solicitation's incorporation of FAR § 52.215-1 *without* its Alternate I. J.A. 2777. *Compare* FAR § 52.215-1(f)(4) ("The Government intends to evaluate proposals and award a contract *without discussions . . . .*"), *with* FAR § 52.215-1, Alternate I (f)(4) ("The Government intends to evaluate proposals and award a contract *after conducting discussions . . . .*") (emphasis added). The Solicitation also expressly states

that "[t]he Government does not intend to hold discussions, but reserves the right to do so, at the sole discretion of the PCO [Procuring Contracting Officer]." J.A. 2777. Further, "[o]fferors are cautioned that the award may not necessarily be made to the lowest priced offeror and that award may be made without discussions." *Id.* Thus, Oak Grove's contention – that the Army's decision not to hold discussions violated DFARS § 215.306(c) – was obvious from the Solicitation itself and had to have been raised before the close of the bid process. As Oak Grove did not do so, this issue is waived under the *Blue & Gold* rule.

In finding that the *Blue & Gold* waiver rule did not apply, the Court of Federal Claims relied on our decision in *Dell Federal Systems, L.P. v. United States*, 906 F.3d 982 (Fed. Cir. 2018). J.A. 35-36. *Dell*, however, considered the distinguishable circumstances in which the Army's contracting officer conceded that the agency had "likely violat[ed] . . . DFARS 215.306(c)(1)" and voluntarily took corrective action based on that determination. 906 F.3d at 994 (internal quotation marks omitted). We were not asked to, and did not, resolve the issue of whether a solicitation's use of FAR 52.215-1 without Alternate I could trigger a *Blue & Gold* waiver. In *Dell*, we did not decide whether the contracting officer's statement was the correct interpretation of the regulation, and nothing about the government's concession in that case binds us here. We disagree with the trial court that *Dell* applies here.

Accordingly, by application of the *Blue & Gold* rule, Oak Grove waived its argument relating to the Army's failure to hold discussions.

2

We next address F3EA's and the government's argument that the Army did not act arbitrarily and capriciously in finding F3EA's proposal acceptable despite F3EA's failure to include teaming agreements. The Court of Federal

Claims agreed with Oak Grove that the Army acted arbitrarily and capriciously.  We do not.

The Solicitation provides that the "[o]fferor shall include in full all executed teaming arrangements, partnerships, joint venture ownership documentation, associate contractor agreement contingencies, as applicable." J.A. 2775.  The Solicitation further states that "any previous teaming arrangements . . . that [are] referenced within the proposal *shall be included as attachments* in the admin volume *as supporting documentation.*  *Id.* (emphasis added).  It also warned that failure to submit a complete proposal including all required information could render an offeror unacceptable and ineligible for award.  J.A. 2762-64.  It is undisputed that F3EA's proposal did not include any written teaming arrangement, even though F3EA's proposal referenced a third party and discussed that party's capabilities and past performance.  J.A. 24-26.

A proposal's failure to conform to a term or condition of a solicitation renders the proposal unawardable only if the violation relates to a term or condition that is material.  *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996) ("[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.").  A "defect or variation is immaterial when the effect on price, quantity, quality, or delivery is negligible when contrasted with the total cost or scope of the supplies or services being acquired."  48 C.F.R. § 14.405.  Whether a term or condition of a solicitation is a material requirement presents a question of law we review de novo.  *See Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1343-44 (Fed. Cir. 2021) ("We apply de novo review to the Claims Court's interpretation of the Solicitation.").

We conclude that the Solicitation's teaming agreement provisions are not material requirements. The non-materiality of these provisions is reflected in Section L.7.7 of the Solicitation, which provides that the "[o]fferor shall include in full all *executed* teaming arrangements . . . *as applicable*," adding that "companies are not locked into any teaming arrangements or subcontractors." J.A. 2775 (emphasis added). It follows that teaming agreements are not always required to be included, as they may be, for example, unexecuted, inapplicable, or changing over time. Moreover, the Solicitation directs the offerors to include teaming agreements in the administrative volume, which is a portion of the proposal that is not evaluated as part of the bid evaluation process. *See* J.A. 2891 (agency confirming "[t]here is no Section M [evaluation criteria] or evaluation for admin volume."). This seems to reflect the Army's anticipation that failing to show the agency any current teaming agreements the offeror is party to would have a negligible impact or effect on price, quantity, quality, or delivery.

By contrast, the Court of Federal Claims found the teaming agreement requirement "serve[d] a substantive and material purpose – ensuring that prime contractors cannot simply claim the capability and experience of another contractor for the purpose of making the offeror's proposal more competitive, absent some concrete evidence that *the described team will actually perform an awarded contract*." J.A. 22 (emphasis added). We disagree. The Solicitation was for an IDIQ contract and, as such, sought proposals for a *sample* task, not an actual task that a winning offeror was expected to perform. The then-current teaming agreements, therefore, may not have any impact on any task the successful offeror will be required to perform.

The Court of Federal Claims further faulted the Army for failing to provide "any supporting rationale" regarding its decision not to find F3EA's bid non-compliant for the lack of teaming agreements. J.A. 25. Given that the

Solicitation does not mandate exclusion from the bid process of an offeror who fails to include teaming agreements, the contracting officer was under no obligation to provide written reasons for why he was not troubled by the lack of inclusion of such agreements in F3EA's proposal. *See Dyn-Corp Int'l, LLC v. United States*, 10 F.4th 1300, 1313 (Fed. Cir. 2021) ("Generally, contracting officers are not obligated by the APA to provide written explanations for their actions.") (cleaned up).

Thus, we conclude that the Solicitation's teaming agreement provisions are not material requirements. Therefore, F3EA's offer did not become unawardable due to F3EA's failure to submit teaming agreements.

3

The Court of Federal Claims' finding that the Army's internal investigation into RM's conduct was inadequate is clearly erroneous. It also appears to be the result of application of an incorrect non-deferential standard of review.

"FAR provides a contracting officer with considerable discretion to conduct fact-specific inquiries of acquisition proposals to identify potential conflicts." *PAI Corp. v. United States*, 614 F.3d 1347, 1352-53 (Fed. Cir. 2010). Moreover, we engage in a "strong presumption" that government officials – including, here, RM, the chairperson of the SSEB – act consistent with their duties. *Sanders v. U.S. Postal Serv.*, 801 F.2d 1328, 1331 (Fed. Cir. 1986). The trial court failed to acknowledge these twin layers of deference, and there is no indication that the court accorded any deference to the agency's investigative process. Rather, the court appears to have substituted its own judgment as to what constitutes an adequate investigation. *See, e.g.*, J.A. 40 ("[T]he Agency did not adequately investigate possible violations . . . , including serious questions of bias or improper conduct impacting the fairness and integrity of this procurement."). Instead of applying what

amounts to de novo review, deference should be given to the decision making and discretion of the Army.

In particular, the Court of Federal Claims found that the agency's "failure to do more" – and especially its failure to interview F3EA's CEO and the two former-employee whistleblowers – "was insufficient under the facts of this case." J.A. 43. Given the deference we accord to the agency, we disagree. The Army's contracting officer conducted numerous interviews and examined written statements from individuals involved in the STOs. All of them confirmed that F3EA played no role in preparing the STOs, directly contradicting the misconduct claims made in the F3EA former employees' emails. J.A. 2911-16. RM also provided a sworn declaration denying Oak Grove's allegations. J.A. 2914-16. In light of these investigative steps, and the evidence amassed, it was not unreasonable for the Army's contracting officer to choose not also to interview RM and the former employees who sent the emails. We do not say that these additional steps would have been in any way inappropriate; we merely hold that it was a proper exercise of the agency's discretion to decide they were unnecessary.

The trial court faulted RM for "play[ing] multiple roles in the procurement." J.A. 44. It focused on what it characterized as RM "review[ing] his own work," in that as the contracting officer representative ("COR") for the award of the RAPTOR III contract he had been the author of some of the past performance references, which in his later capacity as SSEB chairperson for the RAPTOR IV contract he participated in evaluating as "outstanding," J.A. 44. The Court of Federal Claims viewed these as creating "circumstances [which] certainly warranted a more detailed and thorough investigation" than the agency undertook. J.A. 45. While we acknowledge that RM's multiple roles raise concerns, it remained within the agency's discretion to conduct the investigation – which, again, included

multiple interviews, sworn statements, and review and generation of numerous documents – in the manner it did.

The Court of Federal Claims was further troubled by "the Agency's total obfuscation of [RM's] role in this procurement," including the omission from the investigation memoranda of the "critical detail" of RM's role as the chairperson of SSEB. J.A. 45-49. This finding is clearly erroneous. RM's status as SSEB chairperson was noted in documents that were produced to Oak Grove early in the litigation. *See, e.g.*, J.A. 2651 (showing RM signature with title "SSEB Chairperson" in source selection plan document), 2700 (showing source selection team structure).

Investigations are dynamic. A decision as to what actions to take next is often influenced by what has been learned so far. Here, the contracting officer was permitted to be informed by the fact that all direct witnesses to RM's actions denied any wrongdoing and to factor that evidence into a decision not to pursue additional investigative steps. The investigation undertaken was extensive, involving six interviews, obtaining a sworn statement from RM, and producing and gathering a voluminous record. While no doubt a more thorough investigation would also have been justifiable, the specific investigative steps to be taken are generally left to the discretion of the agency and not a reviewing court.

Thus, nothing about the Army's investigation into the allegations relating to RM's role render the agency's decision to award the contract to F3EA arbitrary and capricious.

4

We turn now to Oak Grove's attacks on Lukos.[1] In order to prevail on its bid-protest claims, Oak Grove must demonstrate that it was actually prejudiced by the Army's actions, which here requires a showing that Lukos, as well as F3EA, was not an awardable offeror. *See generally Bannum*, 404 F.3d at 1351 (explaining that, when considering merits of protester's claim, court must "determine, as a factual matter, if the bid protester was prejudiced by" the government's conduct). Otherwise, Oak Grove cannot show it had a substantial chance of being awarded the contract because Lukos, like F3EA, was more highly rated than Oak Grove.[2]

---

[1]    We disagree with F3EA's contention that the Court of Federal Claims violated the party presentation principle by even considering whether Lukos was financially responsible. The government made this issue relevant by pointing to Lukos as a highly-rated bidder that would have blocked Oak Grove from receiving the SOF RAPTOR IV contract even if F3EA were knocked out of the competition by Oak Grove's attacks. *See* J.A. 340-42 (Government's arguing in response to Oak Grove's motion for judgment that "Oak Grove was not 'next in line' for award") (capitalization altered).

[2]    Prejudice is an issue in connection with both standing and the merits of a claim. In considering prejudice as part of evaluating whether a party has standing, we must presume that "the party will, if permitted to proceed with its claim, prevail on the merits." *REV, LLC*, 91 F.4th at 1164. The party is no longer accorded this presumption at the merits stage, at which point a court must "review[] evidence of prejudice on the merits." *Bannum*, 404 F.3d at 1357. This distinction gives rise to the possibility that a

As with its challenges to the Army's actual award of the contract to F3EA, Oak Grove's attempt to demonstrate that Lukos was not a qualified offeror also fails. The Court of Federal Claims found that Lukos could not have been awarded the contract because it was not a financially responsible bidder. Specifically, the trial court found that "the administrative record conclusively demonstrates that Lukos, in fact, was ineligible for a contract award." J.A. 27. The court erred by making this factual determination in the first instance.[3] Thus, the trial court's conclusion that the existence of the higher-rated Lukos offer could not have defeated Oak Grove's effort to prove prejudice on the merits is clearly erroneous.

The administrative record does not "conclusively demonstrate[]" anything about Lukos' financial responsibility or lack thereof. To the contrary, the administrative record is, for valid reasons, incomplete. Because the contract was awarded to F3EA, and not to Lukos, the contracting officer never had any occasion to decide whether Lukos was a financially responsible offeror. If it had ever become necessary for the contracting officer to do so, and if the officer were to have found deficiencies in this regard, the officer would have been required to refer the matter to the SBA, which would have worked with Lukos on potential

---

party will demonstrate prejudice for purposes of standing but fail to do so on the merits.

[3]    In so holding, we do not deny that the record contains indications that Lukos may not have been financially responsible. *See, e.g.*, J.A. 28 (noting DCAA report stating Lukos was "found to be NOT financially capable of performing the contract") (internal emphasis omitted); J.A. 29 (pointing to DCMA report stating Lukos is not found "to be financially capable of supporting" the Solicitation) (internal emphasis omitted).

fixes to the issues. *See* FAR § 9.105-2(a)(2) ("If the contracting officer determines that a responsive small business lacks certain elements of responsibility, the contracting officer shall comply with the procedures [requiring referral to SBA]."); FAR § 19.602-1(a) ("Upon determining and documenting that an apparent successful small business offeror lacks certain elements of responsibility . . . , the contracting officer shall . . . [r]efer the matter to the cognizant SBA [barring other conditions]."). For these reasons, had an assessment of Lukos' financial responsibility been necessary to the Court of Federal Claims' decision, it should have remanded the issue for further agency review rather than attempt to resolve the issue itself on an incomplete record. *See CACI,* 67 F.4th at 1154 ("Typically, . . . if the issue has not been addressed in the first instance by the contracting officer, a remand is necessary for the contracting officer to address the issue of prejudice.").

Accordingly, the Court of Federal Claims erred in finding that Lukos was ineligible to win the contract due to its lack of financial responsibility and in concluding that Lukos' bid did not defeat Oak Grove's effort to satisfy the prejudice component of the merits of its claims.

5

In sum, we hold that (1) Oak Grove waived its argument that the Army was required to hold discussions, (2) F3EA was not required to include teaming agreements in its proposal, and (3) the quality of the agency's investigation into RM did not render its contract award decision arbitrary and capricious. We further hold that the Court of Federal Claims' finding that Lukos' offer could not defeat Oak Grove's showing of prejudice was clearly erroneous. Because the trial court's now-vacated findings on each of these points were the bases of its conclusion that the Army's award of the SOF RAPTOR IV contract to F3EA was arbitrary and capricious, and that Oak Grove was

prejudiced, its entry of an injunction was an abuse of discretion. Hence, we vacate the order enjoining the Army from proceeding with its award to F3EA. *See PGBA*, 389 F.3d at 1223 ("We give deference to the Court of Federal Claims' decision to grant or deny injunctive relief, only disturbing the court's decision if it abused its discretion.").

Oak Grove raised additional challenges to the acceptability of F3EA's and Lukos' bids, relating generally to alleged failures to submit certain documents or to meet budget requirements, that the Court of Federal Claims did not need to reach. *See e.g.,* J.A. 222-23, 246-47, 262-66, 533-34, 591, 608. On remand, the trial court will need to determine if it must resolve these (and any other) issues.[4]

## C

Finally, we address the government's appeal of the Court of Federal Claims' imposition of sanctions for discovery violations. Our review is for abuse of discretion. *See 1-10 Indus. Assocs. v. United States*, 528 F.3d 859, 867 (Fed. Cir. 2008). "A court abuses its discretion if the order imposing sanctions is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* (internal quotation marks and citation omitted). There was no such abuse here.

The Court of Federal Claims sanctioned the government for failing to compile an adequate administrative

---

[4]    The parties advised us at oral argument of a second action pending before the Court of Federal Claims, involving events occurring in the bidding process after the period at issue in this appeal. *See* Oral Arg. at 52:8-18, 52:30-53:06 (available at https://oralarguments.cafc.uscourts.gov/default.aspx?fl=22-1556_03062024.mp3). The impact, if any, of our decision today on the second action is a matter left to the Court of Federal Claims.

record and, thus, wasting judicial resources. Specifically, the trial court faulted the government for omitting two documents from the administrative record: a DCMA report regarding Lukos' financial responsibility and a letter documenting the agency's removal of SSEB chairperson RM from his role in the procurement process. The court explained:

> The Agency's failure to include the omitted documents was neither reasonable nor excusable – it was, rather, an improper compilation, submission, and certification of the administrative record. The omissions delayed resolving this case, wasted the Court's judicial resources by forcing the Court to engage in fact finding on an incomplete record, and imposed substantial costs on Oak Grove.

J.A. 80. These findings, including that the two omitted documents should have been included in the administrative record, are not clearly erroneous.

Appendix C, ¶ 21 of the Rules of the Court of Federal Claims requires the government to "identify and provide (or make available for inspection) the administrative record in a protest case." This rule arises from the fact that "to perform an effective review," the Court of Federal Claims relies on the government to compile "a record containing the information upon which the agency relied when it made its decision as well as any documentation revealing the agency's decision-making process." *Vanguard Recovery Assistance v. United States*, 99 Fed. Cl. 81, 92 (2011). "The court's review function is undermined when an agency assembles a record that consists solely of materials that insulate portions of its decision from scrutiny or that it deems relevant to specific allegations raised by a protester." *Joint Venture Comint Sys. Corp. v. United States*, 100 Fed. Cl. 159, 168 (2011).

As discussed above, the government injected into the litigation the issue of whether Lukos' offer was awardable, and therefore a barrier to Oak Grove winning the contract. Lukos' financial responsibility, therefore, became pertinent to whether Lukos could be awarded the contract. Even though we have ultimately decided that the Court of Federal Claims should not have attempted to determine financial responsibility itself, rather than remand to the Army for SBA to make such a determination, documents related to the issue were relevant to the court's review of the bid protest, due to the government's introduction of the Lukos issue. Thus, it was entirely appropriate for the Court of Federal Claims to find that the DCMA report should have been included by the government in the administrative record.

Likewise, the government knew at the time it prepared the administrative record that Oak Grove was contending that F3EA should not have received the contract due to a conflict grounded in the allegedly improper conduct of the SSEB chairperson, RM. RM's termination from the role of SSEB chairperson occurred in April 2020, *see* J.A. 3950-51, within the period of activity under attack by Oak Grove, which was January through May 2020. *See, e.g.,* J.A. 1623 (government's Notice of Corrective Action dated January 31, 2020); J.A. 2907 (contracting officer's memorandum regarding PIA and OCI allegations dated February 18, 2020); J.A. 3439 (contracting officer's summary memorandum regarding PIA and OCI allegations dated May 1, 2020). Given the centrality of Oak Grove's allegations against RM to the awardability of F3EA's offer, the RM termination letter – even if, as the government contends, it provides reasons unrelated to those raised by Oak Grove – should have been included in the administrative record.

The government failed, however, to produce the DCMA report on Lukos' financial responsibility and the RM termination letter until after merits briefing was completed and oral argument had been heard. J.A. 48 ("[RM termination]

letter was not included in the administrative record until after all of the briefing, oral argument, and status conferences were concluded."); J.A. 64 ("Agency failed to include the DCMA report in the record until after both the completion of the merits briefing and oral argument.") (internal emphasis omitted). The government's "omissions delayed resolving this case, wasted the Court's judicial resources by forcing the Court to engage in fact finding on an incomplete record, and imposed substantial costs on Oak Grove." J.A. 80. The Court of Federal Claims did not abuse its discretion in determining that the government's conduct was not "objectively reasonable" and, therefore, violated Court of Federal Claims Rule 11.[5]

Nor are we persuaded by the government's suggestion that Rule 11 prohibits a trial court from acting on its own initiative to order payment of a monetary penalty to an opposing party. *See* Gov't Br. at 63 n.19. The government cites no binding authority to support this proposition, pointing only to a single opinion of the Court of Appeals for the Tenth Circuit. *See Hutchinson v. Pfeil*, 208 F.3d 1180, 1184 (10th Cir. 2000). While we respect the view of our sister circuit, we have not adopted this limitation on trial courts' discretion ourselves. Moreover, the Rules of the Court of Federal Claims expressly contemplate that "[t]he court must not impose a monetary sanction[] on its own, *unless* it issued the show cause order . . . ." RCFC 11(c)(5) (emphasis added). The trial court in this case issued such an order before imposing the monetary sanction. *See* J.A. 52 ("[P]ursuant to RCFC 11 and this Court's inherent

---

[5]    Although the parties had, in the trial court, disputed the applicable legal standard for imposition of sanctions, on appeal they are in agreement that the government's conduct should be assessed for "objective reasonableness." *See, e.g.*, Oak Grove Br. at 59; Gov. Reply Br. at 27-28.

authority, the Court orders the government to show cause why monetary sanctions should not be imposed against Defendant for its piecemeal and improper handling of the administrative record in this matter."). We see no basis to deem this rule, which was indisputably followed, invalid.

Accordingly, we affirm the trial court's imposition of sanctions.

## IV

Because we find that (1) Oak Grove waived its argument that the Army was required to hold discussions, (2) F3EA was not required to include a teaming agreement in its proposal, and (3) the Army's investigation into RM's alleged misconduct did not render its contract award arbitrary and capricious, Oak Grove has failed to prove that the award of the SOF RAPTOR IV contract to F3EA was arbitrary and capricious. The Court of Federal Claims' finding that another bidder, Lukos, was financially irresponsible and, hence, ineligible to win the contract, is also clearly erroneous. Therefore, the judgment and the injunction ordered by the Court of Federal Claims are vacated. The imposition of discovery sanctions on the government is affirmed. The case is remanded to the Court of Federal Claims for further proceedings not inconsistent with this Opinion.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED**

COSTS

No costs.